In the Matter of EMBRACE SYSTEMS CORPORATION, d/b/a Embrace Technology Systems, Inc., Debtor.

Bankruptcy No. 94–84766.

United States Bankruptcy Court,
W.D. Michigan.

Feb. 16, 1995.

Thomas E. O'Brien, Chicago, IL, and Michael W. Donovan, Grand Rapids, MI, for Embrace Systems Corp.

Patrick R. Sughroue, Grand Rapids, MI, for Eco–Fibre Corp.

Michael L. Gesas, Chicago, IL, and James D. Stone, Macatawa, MI, for Herbert R. Eldean.

Harold E. Nelson, Grand Rapids, MI, for certain so-called Bridge Loan Investors.

Dan E. Bylenga, Jr., Grand Rapids, MI, for Price Waterhouse.

James Triant, Grand Rapids, MI, for Creditors' Committee.

Ronald L. Rose, Detroit, MI, and Douglas L. Lutz, Grand Rapids, MI, for Guardian Fiberglass, Inc.

## OPINION REGARDING DEBTOR'S AMENDED MOTION FOR LEAVE TO ASSUME AMENDED EXECUTORY CONTRACT

JAMES D. GREGG, Bankruptcy Judge.

### I. ISSUES

In this chapter 11 case, should the court, pursuant to 11 U.S.C. § 363(b)(1),[1] approve a transfer of certain technology to an asserted insider buyer without the approval of a chapter 11 plan? Given the facts and circumstances, should the court order the appointment of a chapter 11 trustee?

### II. JURISDICTION

Embrace Systems Corporation, "Debtor", filed an Amended Motion With Respect To Motion For Leave To Assume Amended Executory Contract And Motion For Alternative Relief on February 1, 1995, "Amended Motion". In its Amended Motion, the Debt-

---

**1.** Unless otherwise noted, all future statutory references are to title 11 of the United States Code, sometimes referred to as the "Bankruptcy Code" or "Code".

or seeks to transfer certain technology, customers, and marketing information, to Eco–Fibre Corporation, "Eco", pursuant to a postpetition Amended Exclusive Worldwide License Agreement, the "Amended License Agreement", outside the ordinary course of the Debtor's business. Although all other parties have either consented to the requested relief, or withdrawn their prior objections, Guardian Fiberglass, Inc., "Guardian", has objected to the relief on various grounds. A trial of this contested matter took place on February 6, 7, 8 and 10, 1995, in the bankruptcy courtroom in Grand Rapids, Michigan.

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334. In accordance with 28 U.S.C. § 157(b)(2)(A), (M) and (N), this matter is a core proceeding. This court has the authority to enter a final order in this contested matter under 28 U.S.C. § 157(b)(1). This opinion constitutes the court's findings of fact and conclusions of law. FED.R.BANKR.P. 7052.[2]

## III. FACTS

This matter principally revolves around the continuing attempts of two persons, Curtis Appel, president of the Debtor, "Appel", and David Sanborn, an engineer consultant to the Debtor and president of Apptech, collectively referred to as "Sanborn", to own and control certain technology and business opportunities. They hope to eventually profit from the commercial manufacture of meltblown fibers, fabrics and webs. Very simplistically stated, the technological process involves converting feedstocks (in whole or in part composed of recycled plastic materials) into plastic fiber, by using heat and chemicals and then forcing those materials through an extruder. This meltblown fiber is then processed, per a customer's specifications, into a fabric or web of proper size and density. Potential commercial uses include thermal and acoustical insulation for the appliance and automotive industries. If commercially feasible, these plastic meltblown products eventually will compete with fiberglass as an insulating material. One of the asserted positive attributes of these meltblown products is that they are environmentally friendly because they use recycled materials as raw product and the technological process does not damage water or air quality.

Appel holds a J.D. degree and was previously a practicing attorney for three years. He has also worked in the chemical industry in sales, manufacturing, and recycling of products.

Appel became a director of the Debtor in March, 1993. He became its chief executive officer, "CEO", sometime during the third quarter of 1993. In the last quarter of 1993, the Debtor raised more than $6,500,000 in funds for its capital requirements.

During February, 1994, Appel was terminated as the Debtor's CEO. One week later, he was re-hired as president of the Debtor. At the end of February, 1994, Appel took over the day-to-day operations of the Debtor and he still remains its president.

Appel is also the president of Regenex, Inc., a company that currently is not operating. The Debtor is the largest shareholder of Regenex and, in 1993, held in excess of thirty percent of its stock. Appel owned, and now owns, approximately eight percent of the Regenex stock. During the second half of 1993, nearly all efforts of Regenex were related to developing or improving feedstocks for the Debtor. Although Regenex owed a debt to the Debtor, the Debtor's schedules do not disclose the debt because the Debtor previously wrote off that indebtedness.

Appel, in addition to being on the Debtor's Board of Directors, is a shareholder of the Debtor. Susan & Co., Ltd. holds 50,000 shares of common stock as Appel's nominee.

---

**2.** Because of the importance of this decision, and the constraints on the court's time, on February 14, 1995, four days after the hearing concluded, the court issued an oral bench opinion. At that time, the court stated it would release its written opinion in publishable form as soon as was possible.

The findings and conclusions stated by the court in its oral opinion are consonant with this written opinion in all material respects. The findings of fact are based upon the testimony of the witnesses (including their written declarations), the exhibits which were admitted and, only when necessary and stated, judicial notice of background information contained in the court's file. FED.R.EVID. 201.

Although the Debtor bought stock from shareholders in late 1993 or early 1994 from the substantial capital it raised, the court is unable to now find whether the Debtor purchased any of Appel's stock and, if so, the amount purchased.

Sanborn is the one hundred percent owner of Apptech, an Illinois corporation. Sanborn provides consulting services through Apptech. Sanborn is also the owner of at least 5,000 shares of the Debtor's stock.[3] Although the court lacks details, Sanborn previously consulted with Regenex.

In March, 1994, Appel discovered that the Debtor could produce meltblown fabrics only on the so-called Davis–Standard production equipment, "Davis–Standard Line". The Debtor's production crew was able to only sporadically produce between 30 and 60 pounds per hour of meltblown fabrics that were suitable for thermal and acoustical insulating use. The Debtor was not then able to operate any of the HPM extruders and related production equipment, that the Debtor had engineered, purchased and installed during 1993, the "HPM Line".

In March, 1994, Appel caused the Debtor to engage the services of Dr. Gerald Najour of Visionquest Management Services as a consultant. During March and April 1994, Dr. Najour worked with the Debtor's staff and was able to increase production of meltblown fabrics on the Davis–Standard Line to rates up to 120 pounds per hour.

In March 1994, Appel also approached Sanborn regarding providing consulting engineering services to the Debtor. Even though Sanborn lacked any melt-blowing experience, Appel stated that would not be a problem because Sanborn would work under the guidance of Dr. Najour. In April 1994, Appel engaged Sanborn, through Apptech, to provide consulting services. Sanborn's task was to develop and implement operating parameters for the HPM Line that were consonant with what Dr. Najour had accomplished

while working with the Debtor's staff on the Davis–Standard Line.

During the initial development period, Sanborn became aware that certain equipment in the HPM Line necessary to produce meltblown fabric (and handle the meltblown fabric "downstream") required redesign or reengineering to remedy production problems. Appel requested that Sanborn redesign and reengineer the necessary changes to the equipment. Sanborn agreed to attempt to do so.

No written contract existed with regard to Sanborn's consulting activities or compensation. However, pursuant to the testimony, the Debtor was obligated to pay Sanborn $2,000 per week for consulting services, plus reimbursement for expenses. Sometime in June of 1994, the Debtor lacked money to continue to pay Sanborn.[4] Appel and Sanborn then assertedly entered into an oral agreement whereby Sanborn would continue to work on redesigning and reengineering the HPM Line equipment. The Debtor would only pay Sanborn's expenses. Any future technology developed by Sanborn would be owned solely by Apptech. Sanborn would then "work with the Debtor" to utilize any new technology and use the Debtor's production line to create a successful meltblown fiber business. No written corroboration exists for the asserted oral technology agreement between Appel and Sanborn. Nothing in the record exists to support any approval or ratification of such an agreement by the Debtor's directors.

By mid-July, 1994, Sanborn believed he would be successful in modifying the HPM Line. Prior to and after this time, Sanborn worked on development of the meltdown fiber process at the Debtor's plant, using the Debtor's equipment, and with the assistance of the Debtor's employees. Within six weeks of entering into the asserted oral technology agreement, Sanborn was able to use a three and one-half inch HPM extruder to produce

---

3. The court is unable to determine, based upon conflicting evidence, whether Sanborn holds 5,000 or 7,500 shares of the Debtor's stock. For purposes of this opinion, the number of shares is immaterial.

4. Appel testified that the Debtor was insolvent at the time he became president in late February, 1994. The court finds, for purposes of this hearing, that the Debtor remained insolvent for all relevant time periods.

approximately 600 pounds per hour of melt-blown fibers. Appel told Sanborn that this output made the process commercially feasible.

After the changes to the HPM Line had been developed, Appel and Sanborn discussed the formation of Eco. Sanborn testified that the purpose of incorporating Eco was to continue technology development without going through the Debtor, and to keep Apptech separate from the Debtor.

Apptech then transferred all of its technology to Eco. Sanborn testified that Appel prepared the technology transfer agreement from Apptech to Eco.[5] In general terms, the agreement provides that Eco now owns all meltblown fiber technology rights that Sanborn, through Apptech, previously held. Sanborn is now the president of Eco. Edward Salazar, another former consultant of the Debtor respecting feedstock problems, is the other officer of Eco. Sanborn and Salazar own 100,000 shares and 50,000 shares of Eco stock, respectively.

The other stockholders of Eco are Dr. Jan Arnett and Jerome Bauman. Arnett previously loaned the Debtor $105,000 and owns 40,000 shares of the Debtor's common stock. *See* Debtor's schedules; FED.R.EVID. 201. Bauman previously loaned the Debtor $115,-000 and is not listed as owning any of the Debtor's stock. *See* Debtor's schedules; FED.R.EVID. 201. Although Arnett and Bauman have invested cash in Eco, Sanborn does not know the amounts they invested. Indeed, although there are only four shareholders in Eco, Sanborn does not even know whether Bauman is a man or a woman. Based upon the circumstances, the court finds that Appel recruited Arnett and Bauman as Eco investors.

Sanborn and Salazar have not invested any money in Eco. They received their shares of stock in return for Apptech's asserted technology contribution and Salazar's promise to provide services to Eco in the future. Eco has never had a formal shareholders' meeting. Although Sanborn testified that board meetings have taken place, Eco has no corporate minutebook.

Appel is a "consultant" to Eco. Appel is assisting Eco to arrange short-term financing, to develop a business plan, and to attempt to secure long-term financing to comply with the terms of the proposed Amended License Agreement. Prepetition, during September and October 1994, Appel directed Eco to pay $150,000 to the Debtor in accordance with the prior proposed license agreement. Approximately $100,000 went directly to the Debtor. Approximately $50,000 was disbursed by Eco to creditors or other entities at the direction of the Debtor.

Appel is not now a shareholder, officer, or director of Eco. However, Eco desires to continue to retain Appel's services as a consultant, assuming the Amended License Agreement is approved and long-term financing of Eco is completed as is necessary for Eco's needs. In addition, Sanborn testified that Appel is, or shall be, consulting with Eco on administrative, financial, marketing, and sales matters. At this time, Appel is not paid by Eco. Only his expenses are reimbursed. Sanborn testified that Appel might receive compensation from Eco, depending upon Appel's success in future Eco fundraising activities. It was testified that no promises have been made to Appel regarding any compensation amount, and Sanborn stated this is a "fluid situation".

Based upon the totality of the testimony and the exhibits, the court finds that Appel will receive *some* compensation if he ultimately obtains funding for Eco to carry out the terms of the proposed Amended License Agreement. Thus, Appel has an interest in Eco and is not a disinterested person. *Cf.* § 101(14)(A) and (E); § 101(10) and (5). Indeed, the court finds that Appel testified more for Eco's interests than for the Debtor's interests. The court also received a very strong impression that Appel either was not cognizant of or may have ignored his fiduciary obligations to the Debtor.

The initial License Agreement between the Debtor and Eco was negotiated by Appel and Sanborn and drafted by Appel. Eventually, the Debtor's Board of Directors ratified that License Agreement. This ratification oc-

---

**5.** This technology transfer agreement was not admitted into evidence as an exhibit.

curred at the same board meeting at which the Debtor's directors authorized the Debtor to file for chapter 11 relief.

From September, 1994 to shortly before the hearing on this contested matter, the Debtor, through Appel, attempted to sell its technology. Appel testified that he communicated or negotiated with various entities, including: The Bethlehem Corporation, Bethlehem, Pennsylvania; Universal Process Equipment, Inc., Roosevelt, New Jersey; PET Processors, Painesville, Ohio; and Louisiana Chemical, Baton Rouge, Louisiana. *See also* Amended Motion, paragraph 12. Appel testified that he was involved in an effort to sell the Debtor's and Eco's combined technology. He stated he advised prospective purchasers that the two entities' technology was involved.

Appel contacted possible interested buyers, based upon names given to him by one of the shareholders and pursuant to discussions with brokers. The court finds that Appel acted as an agent for both Eco and the Debtor to attempt to sell their asserted joint technology package. During cross-examination, Appel testified that he did not contact any fiberglass manufacturers because their large investment in that industry gave them a "vested interest" in maintaining fiberglass as the major product for thermal and acoustical insulation.[6]

The Amended License Agreement, which is the subject of this contested matter, was first brought before the court as an exhibit at the hearing. It has not been approved by the Debtor's board of directors. Appel testified that if the court approves the transfer of technology, the Debtor's board will then ratify the agreement.

The proposed Amended License Agreement now provides that the Debtor will transfer certain "Fiber Technology", "Customers", and "Marketing Information" to Eco. The "Fiber Technology" to be transferred includes all of the Debtor's technolo-

gy, including work performed by Sanborn prior to June 1, 1994 only. Because the "Fiber Technology" is also defined to include "all additions, improvements, enhancements, future know how, processes and technology developed from any of the forgoing know how, processes and technologies" [relating to the Debtor], and because of apparent ambiguities in the agreement, the court asked counsel for the Debtor and Eco to clarify the intent of the agreement. Specifically, the parties were asked whether the Amended License Agreement contemplates that any claim or cause of action for post June 1, 1994 technology, which may be held by the Debtor against Eco (through Sanborn or Apptech), would be waived. At first, counsel for the Debtor answered "no," and counsel for Eco answered "yes". After a recess, both parties agreed that the Amended License Agreement should be interpreted to constitute a waiver of any cause of action held by the Debtor to the technology now asserted to be owned by Eco.

In Paragraph 3.1 of the Amended Licensing Agreement, Eco is required to pay the Debtor $50,000 "as a final pre-licensing fee". Paragraph 3.3 of the agreement requires Eco to obtain capital in a maximum amount of $1 million, on or before May 1, 1995.

The court finds that Eco now has no money in its bank account.[7] The only source anticipated for the $50,000 pre-licensing fee is from potential Eco investors. Further, the court finds that Eco now has no firm commitments for capital contributions from any potential investors. The court finds that it is extremely unlikely that Eco will be able to obtain capital in the amount of $1 million, on or before May 1, 1995.

In addition to the $50,000 payment, Eco agrees to pay the Debtor royalties for use of the Fiber Technology, Customers, and Marketing Information to be transferred. Eco will be obligated to pay the greater of 2 percent of its net sales or 14 percent of pre-

---

6. On the other hand, Appel testified that one reason to deny Guardian the opportunity to see the technology demonstration was that Guardian might try to steal the technology. See discussion *infra.*

7. The only money available to Eco is $3,000, which was advanced by Guardian to fund the expenses of a demonstration of the HPM Line technology. Because the demonstration was cancelled, Sanborn testified that this money would be returned to Guardian.

tax net profits to the Debtor within 30 days after the close of each quarter.

Appel and Sanborn testified that Eco expects to commence production within 6 months after the initial $1 million in capital is received, and Eco expects that full production shall be underway within an additional six months thereafter. To accomplish this goal, Appel testified that Eco will obtain, from unknown or undisclosed funders, $2,000,000 to $2,500,000 in new capital during the first year. Although equipment might be leased during the first year, Eco will likely purchase $3,800,000 in equipment within the first two years.

Eco, using projections prepared mostly by Appel, projects that it will earn $28,000,000 in pre-tax profits during its first four years of existence. *See* Debtor's Exhibit 1. After carefully reviewing the exhibit, and considering the evidence in its totality, the court finds that Appel's/Eco's projections are not "pie-in-the-sky" or "chicken-in-every pot" projections, but rather filet mignon-cooking-on-everybody's-gold-plated-barbeque grill projections. The court finds that the projections have absolutely no current basis in fact. They are not corroborated in any material respect by *any* evidentiary source. They are made up, based solely upon Appel's belief. The court finds that these projections must be accorded no evidentiary weight whatsoever.

At this time, Eco and the Debtor have the same address. Eco now has a negative net worth. There is no money available in Eco's checking account. Eco currently conducts no business whatsoever, except its attempt to enter into the proposed Amended License Agreement. The only purchase order that Eco has is one from Mackinaw Sales & Engineering Co., (Objecting Creditor's Exh. B), which expires on October 31, 1995 and which, the court finds, will be impossible for Eco to complete. Eco has not now obtained any approvals of meltblown fiber fabric from the appliance or automotive industries. As previously stated, Eco now has no written funding commitments to adequately capitalize its business.

After the Debtor filed its case on October 21, 1994, the Debtor had no money and could not pay any administrative expenses. Without objection, the Debtor obtained court approval to borrow funds to pay administrative expenses, including its commercial lease obligations. To date, the court is not certain whether the Debtor has borrowed money, although testimony was given that postpetition lease payments have not been made.

Campau Leasing & Development Company, "Landlord", obtained a consent relief from stay, unless the Debtor paid certain rent and lease-related obligations, totaling $19,333.34, on or before February 3, 1995. The Debtor, apparently without sufficient funds, failed to timely pay the Landlord. On February 9, 1995, during the hearing on this contested matter, the Landlord filed an "Affidavit Of Default", which documented that the Debtor's commercial lease had been deemed rejected and the automatic stay of proceedings had been modified to permit the Landlord to undertake appropriate remedies, including eviction of the Debtor from its leased premises. FED.R.EVID. 201. The Debtor has argued that one major reason to approve the Amended License Agreement is so it may receive the $50,000 payment from Eco, which may be used, in part, to pay the Debtor's delinquent lease obligations.

Guardian first became involved with the Debtor after the filing of the Debtor's chapter 11 case. On or about January 20, 1995, Crown Lift Trucks Inc. assigned a claim to Guardian. A Proof of Claim was filed by Guardian on January 23, 1995, in the amount of $1,161.89. Claims Docket # 37; FED. R.EVID. 201. No objection to the claim of Guardian has thus far been filed by any party in interest. Therefore, the claim is currently "deemed allowed" under § 502(a) of the Bankruptcy Code.

On January 23, 1995, Guardian made an offer to purchase certain of the Debtor's assets. It sent a letter and a proposed Asset Purchase Agreement to the Debtor, the Creditors' Committee, and all other parties, through counsel, who had previously appeared in connection with the Debtor's motion to transfer assets. *See* Debtor's Exh. 3. The offer contained many contingencies because Guardian had insufficient information

from the Debtor at the time that the offer was submitted. First, and most importantly, Guardian did not, and still does not, adequately know what technology is asserted to be owned by the Debtor and what technology is asserted to be owned by Eco. Guardian offered to buy *all* the meltblown fiber technology. Second, Guardian wanted to observe a demonstration run of the HPM Line meltblown process. It would then determine whether to resubmit a modified offer, inasmuch as its original Asset Purchase Agreement offer expired on February 1, 1995.

The Debtor and Eco initially consented to show Guardian a test run of the technology. Because neither the Debtor nor Eco had any money to conduct the demonstration, Guardian was requested to give, and gave, $3,000 to fund the demonstration expenses.

The Debtor and Eco subsequently cancelled the demonstration, shortly before it was scheduled to occur, because (1) Guardian raised an issue in its objection as to whether Eco owned the meltblown fiber technology and (2) a potential unidentified funder of Eco objected. Per Appel's testimony, the potential funder asserted that Guardian might steal technological secrets from the Debtor or Eco, even though Sanborn did not believe that this was possible and demonstrations had been previously conducted for other potential buyers.

Sanborn testified that Appel was against showing Guardian the process and that the Debtor's counsel was disappointed there would be no demonstration, because it would be unwise to cancel it. Appel testified that he was not certain that trade secrets could be discovered by Guardian viewing the demonstration and also admitted that Sanborn stated that technological secrets could not be obtained by watching a demonstration. In subsequent testimony, Sanborn backtracked on his original testimony and then stated he didn't recall the reasons for cancelling the Guardian demonstration. To further confuse matters, Appel later testified that he wanted the demonstration to go forward.

The court believes Sanborn's initial testimony and finds Appel decided to cancel the Guardian demonstration. Partially as a result of this action, Guardian has been denied the opportunity to determine whether to submit another bid for the assets the Debtor seeks to transfer.

## IV. DISCUSSION

### A. Guardian's Standing.

■ The threshold question this court must address is whether Guardian has standing to object to the Debtor's Amended Motion to assume the alleged executory contract with Eco. (In Part IV.B. of this opinion, the court addresses the question of whether the "contract" with Eco does indeed fall within the parameters of § 365.) Guardian's standing is at issue because it was not a creditor in the Debtor's bankruptcy case as of the filing of the Debtor's petition under chapter 11. On January 20, 1995, Crown Lift Trucks, Inc. assigned its claim in the aggregate amount of $1,161.89 to Guardian. On January 23, 1995, Guardian filed its proof of claim for that amount with the bankruptcy court. Claims Docket # 37.

■ In answering this question, the court turns to the Bankruptcy Code for guidance. Section 1109(b) of the Code provides that "[a] party in interest, including ... a creditor, ..., may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). Thus, the Code contemplates that a creditor is a party in interest for purposes of raising issues and objections in a bankruptcy case. The Code does not distinguish between creditors existing at the time of a bankruptcy case filing and those that attain creditor status postpetition.

In addition, Bankruptcy Rule 3001(e) specifically contemplates the purchase of creditor claims. The Advisory Committee Notes to the 1991 Amendments state as follows:

Subdivision (e) [of B.R. 3001] is amended to limit the court's role to the adjudication of disputes regarding transfers of claims.... *This rule is not intended either to encourage or discourage postpetition transfers of claims* or to affect any remedies otherwise available under nonbankruptcy law to a transferor or transferee such as for misrepresentation in connection with the transfer of a claim.

Advisory Committee Notes to 1991 Amendments (emphasis added). Denying standing to purchasers of claims, however, would effectively discourage postpetition transfers of claims, in contravention of the intended purpose of Bankruptcy Rule 3001. In addition, no other Bankruptcy Rule provides or implies that the postpetition purchaser of a claim lacks standing to participate in the bankruptcy case in which it has purchased a claim.

The case law also supports this court's determination that Guardian, as the purchaser of a claim in the Debtor's bankruptcy case, has standing to object to the Debtor's Amended Motion. In *In re Rook Broadcasting of Idaho, Inc.*, 154 B.R. 970 (Bankr.D.Idaho 1993), the court held that the purchaser of a claim postpetition had standing to propose a plan of reorganization as a "party in interest" under § 1121(c). The court in *In re First Humanics Corp.*, 124 B.R. 87 (Bankr.W.D.Mo.1991) reached a similar conclusion, holding that the timing of a creditor's acquisition of a claim (prepetition vs. postpetition) did not affect its status as a party in interest for purposes of proposing a plan of reorganization under § 1121. *Id.* at 91. Bankruptcy courts, however, have denied standing to parties that are not creditors, but are interested only in purchasing a debtor's assets. *See e.g., In re Crescent Manufacturing Co.*, 122 B.R. 979, 981 (Bankr.N.D.Ohio 1990) ("Scarborough is not a creditor of this estate; it is an interested purchaser of Debtor's assets or business.... Because Scarborough represents only a perspective [sic] purchaser, the court, as opined at the hearing, finds that it is without standing to object to the instant motions.").

This court recognizes that Guardian wears two hats in this proceeding: as a creditor and as an interested purchaser. It is not Guardian's status as the purchaser of an existing claim that concerns this court; it is Guardian's status as a competitor and an interested purchaser of the Debtor's assets that raises the specter of improper motive. Nonetheless, Guardian's mere status as an interested purchaser does not negate its rights as a creditor to object to the Debtor's Amended Motion. The court will not second-guess Guardian's motives. Rather, the Debt-or must show, by a preponderance of the evidence, that Guardian has objected in bad faith to the Debtor's Amended Motion.

The Bankruptcy Code does not define "good faith." A creditor acting in its own self-interest does not necessitate a finding of bad faith. *Cf. Insinger Machine Co. v. Federal Support Co. (In re Federal Support Co.)*, 859 F.2d 17 (4th Cir.1988) (a creditor that votes against the debtor's plan of reorganization because the creditor views the plan as contrary to its self-interest does not act in bad faith). Therefore, as an unsecured creditor, Guardian may properly object to the Debtor's Amended Motion if Guardian believes that the Debtor's sale proposal provides no real prospect of eventual payment to the unsecured creditors.

In an arguably analogous situation in chapter 11, when a creditor votes to reject a plan, "bad faith" may be shown when the creditor seeks to coerce payment of more than its fair share from the estate, or exhibits an improper ulterior motive such as malice, strikes, blackmail, or purposely seeking to destroy the debtor to advance a competing business. *Id.* at 19. If any such circumstance was present in this contested matter, the court would likely find Guardian had acted in bad faith.

But there are no facts in the existing record to support a finding of bad faith on the part of Guardian. The Debtor has not alleged any impropriety with regard to Guardian's purchase of Crown Lift's claim. While Debtor's counsel has vaguely alluded to Guardian's purchase of standing in this contested matter, the Debtor has put forth no facts which show that Guardian's motivation in objecting is suspect, e.g., to destroy the Debtor's ability to reorganize. Moreover, this court would be reluctant to find that Guardian has acted with an improper motive without giving Guardian at least some chance to summarily address such allegations, with some advance notice, however limited. *Cf.* § 1126(e) (after notice and hearing, court may designate an entity whose acceptance or rejection of chapter 11 plan was not in good faith).

The court determines that Guardian has standing to object to the Debtor's Amended Motion. No facts exist in the record to impugn Guardian's motivation in objecting to the Debtor's Amended Motion. Moreover, this court would require some form of advance notice to Guardian prior to making such a factual determination, unless the prohibited motivation was clear in the record itself. Because no such facts exist in the record, the court need not reach the issue of whether a finding of bad faith would destroy Guardian's standing to object or merely negate the validity of its objection to the Debtor's Amended Motion.

## B. Standards to Grant or Deny the Amended Motion.

### 1. Does § 365 or § 363 Govern?

■ The Debtor originally filed a Motion For Leave to Assume Executory Contract on November 21, 1994. The Debtor sought to assume, pursuant to § 365, the Exclusive Worldwide License Agreement, dated September 1, 1994, and signed by Appel, president of the Debtor, and Sanborn, president of Eco. The original License Agreement essentially contemplated a sale of the Debtor's entire business. It included not only an exclusive license of the Fiber Technology, but also a transfer of all machines and equipment owned, leased, or used by the Debtor. After the Debtor received numerous objections to its original assumption motion, the Debtor filed the Amended Motion. Pursuant to this Amended Motion, the Debtor sought to assume, pursuant to § 365, the Amended Exclusive Worldwide License Agreement with Eco.

The Amended License is not some minor modification of an existing executory contract between the Debtor and Eco; it is an entirely new agreement. The Debtor has made the following significant modifications to the terms of the original License Agreement: (1) the Amended License does not provide for a transfer of any hard assets of the Debtor; (2) the Amended License provides for different royalty payment percentages; and (3) the indemnification provisions were deleted from the Amended License Agreement.

The problem is that this Amended License Agreement does not fall within the scope of § 365 because it is not an executory contract. There is no indication, in fact, that the parties have any contractual relationship at this point. The document proffered by the parties as the Amended License Agreement has not been signed by any representative of either the Debtor or of Eco. It is not dated. It has not been approved by the Debtor's Board of Directors. The testimony suggests that the parties are seeking the court's advance approval to enter into the agreement; once the court gives its imprimatur to the Amended License Agreement, then the parties (presumably) will sign the document and present it to their respective boards.

Section 365 of the Code involves *assumption* of executory contracts. By definition, an assumption means that a contract already exists. Section 365 does not govern the standards by which a debtor may enter into *new* contracts postpetition; rather, it sets forth requirements for a debtor to either assume or reject a contract that was already in existence prepetition and has not yet expired. Therefore, regardless of the title of the Debtor's motion, or the form of the request, § 365 does not govern the standards applicable to this contested matter.

■ If § 365 does not apply, then which provisions of the Bankruptcy Code govern? The court turns to § 363 of the Code which relates to use, sale, or lease of property. The initial question is whether the Debtor's Amended License Agreement, which provides for a 50–year license of the Debtor's Fiber Technology, constitutes a sale under § 363. In making this determination, the court examines the record in this contested matter. For the following reasons, the court concludes that the 50–year license to Eco essentially amounts to a sale of the Debtor's Fiber Technology.

■ First, at the Assumption Motion hearing, the Debtor indicated that after the court approved its Amended License Agreement, the Debtor planned to conduct an auction sale of all of its hard assets. The combination of the Fiber Technology license with the sale of the hard assets amounts to a liquidation of the Debtor's business. Second, the

Amended License Agreement has a term of 50 years, but does not explicitly provide that the Fiber Technology reverts to the Debtor in the year 2044. Third, the Amended License Agreement, if approved, would give Eco the right to sell the Package, which consists of the Fiber Technology, Customers and Marketing Information. The court wonders how Eco could sell that which it only holds a mere license to exploit. Fourth, the Amended License Agreement, if approved, would transfer *all rights* to the Fiber Technology to Eco; the Debtor would retain no rights to use or license the technology, at least until the year 2044. *Cf.* Ernest Bainbridge Lipscomb III, 5 WALKER ON PATENTS § 19:12 at 366 (3d ed. 1986) ("A transfer constitutes a sale when there is a grant of all substantial rights of value in the patent."). Finally, the court must look not to the terminology used by the parties, but to the substance of the transaction. *Cf. id.* (citing *Bell Intercontinental Corp. v. United States*, 381 F.2d 1004, 1011, 180 Ct.Cl. 1071 (1967)) ("Whether a transfer constitutes a sale or license is determined by the substance of the transaction.... The question does not depend upon the labels or the terminology used in the agreement."). The combination of the Debtor's intent to liquidate its business, the length of the proposed license, and the scope of the rights conveyed under that license mandates a conclusion that the Amended License Agreement proffered by the Debtor constitutes a sale of the Debtor's Fiber Technology.[8]

### 2. General Considerations Regarding Sales Under § 363.

■ A large measure of discretion is available to a bankruptcy court in determining whether a private sale should be approved. *In re Blue Coal Corp.*, 168 B.R. 553, 564 (Bankr.M.D.Pa.1994). The court should exercise its discretion based upon the facts and circumstances of the proposed sale.

■ A sale of assets is appropriate if all provisions of § 363 are followed, the bid is fair, and the sale is in the best interests of

the estate and its creditors. *In re Charlesbank Laundry Co.*, 37 B.R. 20, 22 (Bankr. D.Mass.1983). In this matter, Eco's offer now appears to be unfair and the sale is not in the estate's best interests. Also, in circumstances such as this, where the sale has been arranged by Appel, the Debtor's president who has an interest in Eco, as the prospective buyer, the sale should not be approved. *See In re WHET, Inc.*, 12 B.R. 743, 751 (Bankr.D.Mass.1981). (court states that circumstances under which a proposed sale of substantially all of a debtor's assets would be inappropriate include a case "where the sale has been arranged by the debtor who is to have an interest in the purchasing entity."); *accord In re Ancor Exploration Co.*, 30 B.R. 802, 807–08 (N.D.Okla.1983).

■ "When a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold." *In re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr.S.D.N.Y.1992), (citation omitted) *aff'd*, 147 B.R. 650 (S.D.N.Y.1992). In general, a debtor must demonstrate that the proposed purchase price is the highest and best offer. *Id.* In this matter, for reasons stated in the factual findings, the Debtor has not met its burden. There has been no showing that the marketing of the assets has been diligent or sufficient.

■ If there is any degree of fraud, unfairness, or mistake, the bankruptcy court should assess the impact of these factors on the sale at issue when the offer is compared to the court's finding of valuation of the assets to be sold. *In re Blue Coal Corp.*, 168 B.R. at 565. In this case, the court has made no, and is unable to make a, finding as to valuation. There has been no appraisal or other sufficient valuation evidence presented. Appel has testified it is a "waste of time" to place a value on the property because there is "no objective ascertainable standard to utilize based upon the uniqueness of the technology" and, further, because the Debtor lacks money to pay for an appraisal.

---

**8.** Although not dispositive, this court notes that counsel for the Debtor and Eco each stated, after questioning by the court, that the Amended License Agreement amounted to a sale of the Debtor's Fiber Technology.

██ The chapter 11 Debtor has a fiduciary duty to the estate. As the Debtor's president, Appel has a duty to make inquiry as to the value of property sought to be transferred; he must do at least as much as he would if the sale were in his own interest in the Debtor's capacity. *See Matter of Chapin,* 2 B.R. 373, 375 (Bankr.S.D.N.Y.1980) (trustee, as fiduciary for the estate, has a duty to inquire as to property's real value, at least to the same extent he would if the property were his own). The record does not permit any finding that Appel has met this fiduciary obligation.

Given the Debtor's and Eco's position that Eco already owns some of the meltblown Fiber Technology, which is an asserted fact this court believes is problematic, and given the cancellation of a demonstration of the HPM Line to a competing bidder, i.e., Guardian, the court finds that unfairness exists. Indeed, considering the questionable circumstances surrounding this proposed transfer of technology and all of the interconnections between the Debtor (through Appel) and the purchaser Eco, the court even sniffs a possibility that silent fraud exists.[9]

While the court does not believe the testimony and projections about Eco's prospective financial and manufacturing capabilities and, thus, chooses to disregard it, the court does not consider the evidence to be a sufficient basis for now finding fraud. *See Bose Corp. v. Consumers Union,* 466 U.S. 485, 512–13, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984) (citation omitted) ("When the testimony of a witness is not believed, the trier of fact may disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion."); *accord Duddy v. Kitchen & Bath Distribs.*

*(In re H.J. Scheirich Co.),* 982 F.2d 945 (6th Cir.1993).

██ Even when a bankruptcy court finds unfairness or bad faith, it retains "discretion to approve the sale should the estate be so desperate for a buyer that a rejection of the offer would be devastating to creditors." *Blue Coal Corp.,* 168 B.R. at 569. Although the Creditors' Committee supports the proposed sale, and its counsel characterizes the sale as an "option" being granted to Eco, no such compelling desperation now exists. First, Eco has no present ability to pay the $50,000 downstroke required by the Amended License Agreement. Second, the court has found Eco's future business projections, and its ability to adequately capitalize itself, to manufacture product, and to generate profits, to be illusory, and perhaps verging on being fictitious. If the Amended License Agreement is not approved, creditors will lose nothing. To the contrary, if the assets are later sold to someone who has a demonstrable ability to pay, the estate will receive something.

### 3. Special Considerations Regarding Chapter 11 Sales.

██ An issue exists under what circumstances a bankruptcy court may authorize a sale of all, or a major portion of, a chapter 11 debtor's assets outside a plan of reorganization. In this circuit, "a bankruptcy court can authorize a sale of all a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action." *Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 390 (6th Cir.1986). In this contested matter, the *Stephens* case is applicable and supplements the general considerations relating to approval of sales outside the ordinary course.[10] *See* Discussion Part IV.B.2. *supra.*

---

9. Fraud may occur by suppression of facts as well as by positive false assertions because such a suppression may suggest a falsehood. There must be a legal or equitable duty to disclose in order for suppression of information to constitute silent fraud. *Sumitomo Trust & Banking Co., Ltd. v. Holly's, Inc. (Matter of Holly's, Inc.),* 140 B.R. 643,694 (Bankr.W.D.Mich.1992), citing and quoting *United States Fidelity & Guar. Co. v. Black,* 412 Mich. 99, 125, 313 N.W.2d 77, 88 (1981). The Debtor and Appel have a duty to disclose information to this estate. Whether this was adequately done remains an issue.

10. The court finds the Debtor has three major categories of assets: (1) the "soft" assets, including the Fiber Technology, subject of this proposed sale to Eco; (2) the "hard" assets, i.e., predominately the Davis–Standard Line and the HPM Line equipment; and (3) the Debtor's California operations, known as the CRM subsidiary.

With regard to CRM, the court now lacks meaningful information. However, the record shows that the Debtor's interest is disputed and the Debtor may recover little, if anything, from this asset.

■ In *Stephens*, the Sixth Circuit explicitly adopted the reasoning of *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2nd Cir. 1983). In *Lionel*, the relevant factors were listed as (1) "the proportionate value of the asset to the estate as a whole", (2) "the amount of elapsed time since the filing", (3) "the likelihood that a plan of reorganization will be proposed and confirmed in the near future", (4) "the effect of the proposed disposition on future plans of reorganization", (5) "the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property", (6) "which of the alternatives of use, sale or lease the proposal envisions", and (7) "most importantly perhaps, whether the asset is increasing or decreasing in value." *Lionel*, 722 F.2d at 1071. These factors are not exclusive and are intended to provide guidance to a bankruptcy court. *Id.* at 1071. Neither *Lionel* nor *Stephens* require that each of the above factors must always be considered. Also, to the extent any factors are utilized, there is no necessity that those factors considered must be given equal weight to determine the outcome. When a chapter 11 sale is requested, in each instance, the unique facts and circumstances must be considered and weighed rather than applying some concrete predetermined formula.

Has the Debtor shown sufficient business justification for approval of the proposed Amended License Agreement? The answer is "no".

The assets subject of the sale represent the great bulk, if not all, of the Debtor's possibly unencumbered assets. This is not an instance when a single vehicle or some unnecessary minor asset is sought to be sold.

This case was filed on October 21, 1994, and it is now slightly less than four months old. On a chapter 11 timeline, the case is reasonably young and there remains time for the Debtor, or another entity, to propose a plan, assuming one is possible. There exists sufficient time to adequately disclose material facts with regard to any future proposed sale, either outside or inside a chapter 11 plan. *Lionel*, 772 F.2d at 1070 (the key to chapter 11 reorganization is proper disclosure). Although it is now uncertain whether any plan ultimately may be confirmed, the court finds the current proposed sale will not advance the goal of effective reorganization.

Counsel for the Debtor and the Creditors' Committee assert that a plan can be proposed based upon Eco's future royalty payments to the estate. The court disagrees because those payments are phantomlike and not based upon persuasive or supported projections.[11] A future plan remains possible if another prospective buyer is found who may make another offer, a new funder is willing to invest in and take over the Debtor's operations, or possible causes of action are ultimately resolved to generate assets for distribution.

With regard to what normally is the most important factor, i.e., whether the asset is increasing or decreasing in value, reference to the record is warranted. Appel testified that the Fiber Technology was decreasing in value. He also opined that as time progressed, some other company would step in and fill the Debtor's shoes if the Amended License Agreement were not promptly ap-

---

Based upon statements by counsel and some testimony, the court finds that the total value of the hard assets is approximately $600,000 to $625,000 and the aggregate claim secured thereby, i.e., by Eldean and the so-called Bridge Loan Investors, is in excess of $1,200,000. It appears the two secured creditors are under water pursuant to 506(a) and the estate will receive little, if any, proceeds from a possible sale of the equipment.

The court therefore finds, for purposes of this contested matter, that the only known significant (and possibly unencumbered) assets are the Fiber Technology, Customers, and Marketing Information which are subject of the proposed sale. Therefore, the *Stephens* case must be considered.

**11.** However, if a plan were filed and, after approval of an adequate disclosure statement, all classes of creditors approved the plan without objection, the court would likely confirm the plan under § 1129(a). In such an instance, the creditors would determine whether to take the risk that royalties might never be received as projected. The problem is, in an instance like this, when a sale is sought outside the chapter 11 plan process, creditors (and for that matter shareholders) receive insufficient disclosure and are not entitled to vote to assume the risk of nonperformance or possible default. The decision must, therefore, be shouldered by the court.

proved by the court and the Fiber Technology not conveyed to Eco.

The court finds this testimony problematic. First, neither the Debtor nor Appel provided the court with *any* valuation of the asset package to be sold pursuant to the Amended License Agreement. With regard to the value of the Fiber Technology, Appel testified that he did not seek an appraisal of this significant corporate asset because, in part, it was too unique to value. Yet Appel and the Debtor now expect this court to conclude, on absolutely no factual basis, that this asset is declining in value. How does the Debtor expect this court to conclude that an asset is declining in value when no initial value and no current value of the asset in question is presented to the court?

Second, the court finds unpersuasive Appel's testimony that some other company will eventually step in and develop a similar form of technology. That may well be true, but it certainly does not necessitate an immediate sale of this important asset of the Debtor. The development of this technology did not occur overnight. The Debtor did not identify any competitors on the brink of developing the Fiber Technology. The court concludes that the Debtor has failed to demonstrate, by a preponderance of the evidence, that the asset package (in particular, the Fiber Technology) is depreciating in value, thereby necessitating an immediate sale under § 363(b)(1).

The court also finds the sale is not commercially reasonable. It is collusive and not in good faith, for the reasons discussed elsewhere in this opinion. The *only* circumstance in which the court might even consider *this* proposed sale would be in connection with a plan, with complete disclosure of all material terms, and an affirmative vote by all classes of creditors. If creditors were desperate enough to take the risk, and the proposed plan otherwise complied with all confirmation requirements, the sale would be approved as part of the plan. *See* § 1123(b)(4) (permissive sale under plan); and § 1123(b)(3)(A) (settlement of possible claim by Debtor against Eco for post-June 1,

1994 technology). However, this sale does not pass muster under *Stephens and Lionel,* and cannot be approved.

### 4. *Lack of Good Faith.*

It has been held "that when a bankruptcy court authorizes a sale of assets pursuant to Section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *In re Abbotts Dairies Of Pennsylvania, Inc.,* 788 F.2d 143, 149–50 (3rd Cir.1986). In the analogous situation of a § 364 borrowing order, the Sixth Circuit has cited *Abbotts Dairies* approvingly. *New York Life Ins. Co. v. Revco, D.S., Inc. (In re Revco D.S., Inc.),* 901 F.2d 1359, 1366 (6th Cir.1990) (holding that "an implicit finding of 'good faith' in a § 364(e) context is insufficient, and that 'good faith' under that section should not be presumed").

> The requirement that a purchaser act in good faith ... speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*In re Abbotts Dairies,* 788 F.2d at 147, quoting *In re Rock Indus. Mach. Corp.,* 572 F.2d 1195, 1198 (7th Cir.1978).

In this contested matter, the facts and circumstances mandate a finding that there exists collusion between the Debtor [12], through Appel, and Eco as prospective purchaser, through Sanborn and/or Appel. There also exists evidence of an attempt to take unfair advantage of other prospective bidders. Lastly, there exists some evidence of material nondisclosure and perhaps silent fraud. (*See* discussion in Part IV.B.2. *supra.*)

Based upon the totality of the record, the proposed sale by the Debtor to Eco smacks of a "sweetheart deal" or, as argued during closing by Guardian's counsel, the "deal is fixed". A number of facts abundantly support such a conclusion.

12. The chapter 11 Debtor is a debtor-in-possession and exercises the powers and must perform all duties, with some specified exceptions not applicable here, of a trustee. § 1107(a).

The proposed sale is not an auction sale which permits competitive bidding. Basically, the Debtor seeks approval of the Amended License Agreement on a "take it or leave it" basis. However, even assuming that an auction sale occurred, as was requested by the Debtor as a form of alternative relief, under the facts, no meaningful competitive bidding is possible. Pursuant to the alleged June, 1994, oral technology agreement, Appel seemingly "gave away" the Debtor's claim to a valuable technology asset without a written agreement and without approval of the Debtor's board of directors. Appel now projects (even though the court does not believe those projections) that the combined technology of the Debtor and Eco will result in net pre-tax profits totaling in excess of $28,000,000 within four years after approval of the Amended License Agreement.[13] Why would Appel, on behalf of the Debtor, be willing to sacrifice such valuable technology in exchange for Sanborn's services, which were valued at $2,000 per week plus expenses? Why did Appel not retain a non-exclusive license for the post-June 1, 1994 technology on behalf of the Debtor? It is also incredible to the court that material terms of this asserted agreement were not documented in writing, especially given that Appel is an attorney.

Appel, president of the Debtor, discussed and agreed with Sanborn to form Eco. Sanborn testified that he did not incorporate Eco and he was uncertain as to who actually accomplished the incorporation. If not Appel, who else? The court does not believe that the incorporation was carried out by Salazar, Arnett, or Bauman. No testimony exists that any of those persons were actively involved in Eco. The only reasonable finding is that Appel prepared, or caused someone to prepare, the Eco incorporation documents.

Apptech, Sanborn's consulting company, transferred its alleged ownership of the post-June 1, 1994, technology to Eco. According to the testimony, who prepared this document? Appel did.

The original License Agreement was supposedly drawn up on or about September 1, 1994. Who was involved in this agreement? Appel was. That agreement was not ratified by the Debtor's board of directors until shortly before filing of the Debtor's chapter 11 case. Indeed, the original License Agreement was ratified at the same meeting that the board authorized the chapter 11 filing. Why was there a delay in ratifying that proposed agreement? Given the fact that the Debtor asserted at the hearing, through Appel, that the Amended License Agreement is crucial to the Debtor's "survival", the delay is inexplicable.

Appel, kindly stated, has played a very questionable role in Eco's affairs. Because Sanborn testified that he did not recruit the other shareholders, i.e., Arnett and Bauman, the court concludes that Appel did. Appel also caused Eco to make the so-called pre-license payment of $150,000 to the Debtor. Where did these funds come from? Given Sanborn's testimony that he is not well-versed in Eco's financial affairs, the only logical finding is that Appel raised these funds.

Sanborn originally testified, and the court accepts the testimony to be true, that Appel eventually would be paid by Eco for his "consulting" services, based upon the amount of funds that Appel might raise for Eco. Even though the testimony was that no compensation had been agreed to and no promises made, the court believes it is reasonable to find that Appel has a vested interest in Eco's survival and success. The court disbelieves Appel's self-serving testimony that he is working solely (or even predominately) for the Debtor's creditors and shareholders. At a minimum, Appel has an important contingent financial interest in Eco.

Eco is an Illinois corporation that appears to run its very limited business, if any, out of the Debtor's Grand Haven plant. Based upon the schedules, and some statements before this court, the Debtor and Eco have the same address. Although Sanborn testified that Eco has no office at the Grand Haven plant, he also testified that he has answered the telephone at that plant by iden-

---

13. The court notes that Appel's projections are also premised upon adequate capitalization to acquire equipment, labor, and other necessities to commercially produce the meltblown fibers, fabrics and webs.

tifying Eco's name. Although Eco asserts it owns the post-June 1, 1994 fiber technology, as a result of an agreement with, or license from, Apptech, it is consequential that the technology was developed using the Debtor's HPM Line equipment, at the Debtor's plant in Grand Haven, with assistance from the Debtor's employees.

These facts lead to a compelling conclusion that collusion exists between the Debtor and Eco, by and through Appel and perhaps Sanborn, to obtain approval of a sale of the Debtor's technology and future business opportunities. If the sale is approved, Eco will own the Debtor's most valuable asset, free and clear of claims of the Debtor's creditors and shareholders, in exchange for $50,000 and a chimerical promise to pay future royalties.[14]

In addition, the evidence demonstrates that the Debtor and Eco have been unfair to other prospective bidders, most particularly Guardian. The demonstration of the meltblown fiber production process was cancelled by Appel, or the cancellation was caused by Appel, after consultation with one of Eco's possible funders, without reasonable justification. By viewing any demonstration of the HPM Line process, Guardian would not be able to "steal" any of Eco's (or for that matter the Debtor's) secrets. Although Guardian may not have been able to bid as a practical matter, based upon Appel's and Eco's assertion as to ownership of the meltblown fiber technology, cancellation of the demonstration created yet another impediment to Guardian's ability to analyze whether it should make a competing bid.

The court makes an explicit finding that Eco, as a prospective purchaser, lacks good faith. The court also makes an explicit finding that the Debtor, by Appel's actions and omissions, lacks good faith. See also IV.B.2. *supra.*

### C. Should the Court Order, Sua Sponte, the Appointment of a Chapter 11 Trustee?

■■■■ A bankruptcy court may *sua sponte* raise the issue of whether a chapter 11 trustee should be appointed. *Matter of Mother Hubbard, Inc.,* 152 B.R. 189, 197 (Bankr.W.D.Mich.1993). This issue may be raised when "persuasive evidence comes to the court's attention on the record which may lead to a conclusion that cause exists or an abuse of process is occurring." *Id.*

■■■ In this contested matter, after notice and three and one-half days of hearing, the court has found that Appel, the Debtor's president, has engaged in activities that are detrimental to the estate and its creditors. Postpetition, Appel has sought approval of the Amended License Agreement with Eco when he is serving as Eco's consultant, is not disinterested, and holds an interest adverse to the estate. Given the total record, the court strongly perceives that Appel is much more concerned about Eco's future (and its attempt to capture the meltblown fiber technology) than any possible success of the Debtor's chapter 11 case. The court has found that the Debtor, through Appel, acted unfairly, and lacks good faith, in pursuing the private sale to Eco.

Also very important, from the court's perspective, is the possible existence of a cause of action regarding the ownership of the post-June 1, 1994 technology, which is claimed by Eco pursuant to the oral agreement assertedly entered into by Appel and Sanborn.[15] Although no valuation of this technology has been made, the court believes

---

14. Under the Amended License Agreement, what would prevent Eco from selling or licensing the technology to yet another entity? If Eco does not operate, or sell product, or make any profit, what royalties would be owed? Because paragraph 6 of the Amended License Agreement states "In order for Eco to maintain exclusive rights to exploit the Package, Eco shall not be required to generate any specific minimum sales proceeds from the exploitation of the Fiber Technology", Eco would have a very strong argument that it is not required to pay *any* royalties to the

Debtor's estate, if and when the asset package is subsequently transferred.

15. During the hearing, upon questioning by the court, counsel for both the Debtor and Eco indicated that it was the parties' intent in the Amended License Agreement to transfer any interest the Debtor may have in the post-June 1, 1994 technology. This is tantamount to a hidden settlement, without disclosure to creditors, and is violative of the Bankruptcy Code and Bankruptcy Rules. FED.R.BANKR.P. 9019.

that this asset may be very important to whomever may own it. Until this issue is resolved by litigation, or court-approved settlement after full disclosure, it will be very difficult, if not impossible, for the Debtor to sell its uncontested technology to any other entity. Further, until this issue is resolved, any party's ability to propose a chapter 11 plan is, at best, dubious. The court finds that given his testimony and interest in Eco, Appel is *not* the person to investigate and determine whether litigation is warranted or the possibility of a reasonable settlement exists. He is *not* currently the person to propose a plan. To the extent the Debtor may have any business operations, he is *not* the person who should operate the Debtor.

The chapter 11 process is premised upon full disclosure to parties in interest. *Cf.* § 1125. Such disclosure requires revelation of all material facts—both the good and the bad. Corporate debtors take actions and make decisions through individual persons. Appel, who is concerned with Eco's future and the maintenance of the technology thus far developed for its benefit, holds an adverse interest to the Debtor's estate. He should not be permitted to continue to exercise the Debtor's fiduciary obligations. Compelling cause exists pursuant to the court's findings herein to forthwith remove Appel as the Debtor's individual decision-maker.

Given the present record, it appears to the court that the Debtor now has no other employees to comply with its duties and obligations. Further delay in this case is not in the interests of the creditors and equity security holders and will be prejudicial. An independent examination of the Debtor's assets, liabilities, potential causes of action,[16] ability or inability to sell assets, and any potential to propose a plan of reorganization must proceed expeditiously. An independent disinterested person must *now* be appointed.

Based upon its findings of fact herein, after a full hearing on the record, the court holds an appointment of a chapter 11 trustee is both necessary and proper, both for "cause" and to serve the "interest of creditors". § 1104(a)(1) and (2); § 105.[17]

## V. CONCLUSION

Under the facts in this contested matter, the Debtor's Amended Motion to Approve the Amended License Agreement constitutes a sale rather than a requested assumption of an executory contract. Approval of the sale is denied, *inter alia,* because of unfairness and lack of good faith.[18] Appointment of a chapter 11 trustee, *sua sponte,* is now mandated pursuant to the court's findings of fact.

---

16. An investigation, and perhaps litigation, of the ownership of the post-June 1, 1994 technology is an important issue. During closing argument, Guardian's counsel stated it may be willing to finance the litigation on behalf of the estate based upon certain conditions stated on the record.

17. To the extent that any plan may be proposed, other entities may now do so. Appointment of a chapter 11 trustee terminates a debtor's exclusive period to file a plan. § 1121(c)(1).

18. The Debtor's alternative request for an auction sale is also denied, without prejudice to the soon-to-be-designated trustee to seek such relief.