100 F.3d 1214
 In re: 255 Park Plaza Associates Ltd. Partnership, Debtor.
255 Park Plaza Associates Ltd. Partnership (95-1738) and First of America Bank -- Southeast Michigan, N.A. (95-1761), Plaintiffs-Appellants,
v.
Connecticut General Life Insurance Company, Defendant-Appellee.
 Nos. 95-1738/1761
 United States Court of Appeals,
Sixth Circuit
 Argued September 19, 1996
Decided November 19, 1996
 
 On Appeal from the United States District Court for the Eastern District of Michigan
 Sheldon S. Toll, (argued and briefed) Honigman, Miller, Schwartz & Cohn, Detroit, MI, for 255 Park Plaza Associates Ltd. Partnership.
 Robert D. Mollhagen (briefed), Howard & Howard, Bloomfield Hills, MI, James H. Geary (argued), Howard & Howard, Lansing, MI, for First of America Bank-Southeast Michigan, N.A.
 William T. Burgess, Dickinson, Wright, Moon, Van Dusen & Freeman, Bloomfield Hills, MI, Clifton R. Jessup, Jr. (argued and briefed), Dixon & Dixon, Dallas, TX, for Connecticut General Life Insurance Company in No. 95-1761.
 Before: GUY, RYAN, and MOORE, Circuit Judges.
 MOORE, J., delivered the opinion of the court, in which GUY and RYAN, JJ., joined, with GUY, J. (p. 13), also delivering a separate concurring opinion.
 MOORE, Circuit Judge.
 
 
 1
 The debtor in this single-asset Chapter 11 bankruptcy case, 255 Park Plaza Associates Limited Partnership ("Debtor"), and First of America Bank--Southeast Michigan, N.A. ("FOA"), a creditor of Debtor, appeal the decision of the United States District Court for the Eastern District of Michigan, which affirmed the decision of the United States Bankruptcy Court for the Eastern District of Michigan. The bankruptcy court confirmed the plan of reorganization submitted by Connecticut General Life Insurance Company ("Connecticut General") and denied confirmation of Debtor's plan. The bankruptcy court also voided the claim of FOA for lack of consideration and lack of a promise by Debtor to pay FOA. Because Debtor's and FOA's appeals are moot, we dismiss the appeals for lack of jurisdiction.
 
 I. Background
 
 2
 Debtor, a Michigan limited partnership, owned and operated an office building at 255 S. Woodward Avenue, Birmingham, Michigan. The property, which was Debtor's primary asset, was valued at $7.5 million. Connecticut General held a valid first mortgage on the property and also held a valid first security interest in all of the rents, profits, and leases from the property. The mortgage and security interest were security for an $8 million promissory note executed by Debtor and payable to Connecticut General. On March 8, 1993, Debtor commenced this single-asset bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code. At the time of filing, Debtor was indebted to Connecticut General for $8,161,339.17.
 
 
 3
 Debtor and Connecticut General filed competing plans of reorganization. While Debtor's plan proposed a reorganization of Debtor, Connecticut General's plan proposed a liquidation of the property through a sale. On July 14, 1993, Connecticut General sent letters to all non-insider unsecured creditors offering to purchase their respective claims against Debtor. It subsequently purchased all but one of these claims. Connecticut General, however, refused to recognize FOA's alleged claim. FOA possessed a mortgage on the property that was granted by Debtor after Connecticut General's mortgage was granted. The mortgage was given for a $1.5 million promissory note, which was executed and delivered by Bloomfield Long Lake Associates Limited Partnership ("Bloomfield") and further secured by a separate guarantee from Mike Kojaian, C. Michael Kojaian, and Kenneth J. Kojaian ("the Kojaians"). The Kojaians are the sole and equal limited partners of Debtor, and they are the sole and equal shareholders of the corporation that is Debtor's general partner. They also control Bloomfield under a similar relationship. J.A. at 1924. It is undisputed that Debtor never signed the promissory note, guarantee, or any other debt instrument for FOA.
 
 
 4
 Connecticut General filed an objection to FOA's claim, contending that Debtor had made no promise to pay, that there was no consideration given to Debtor, and that FOA had no value in the property. The bankruptcy court agreed with Connecticut General and entered an order finding that FOA had no claim under the Bankruptcy Code.
 
 
 5
 The bankruptcy court next confirmed Connecticut General's plan and denied confirmation of Debtor's plan. Debtor then appealed to the district court, alleging numerous deficiencies with Connecticut General's plan and challenging the denial of its own plan as well as the denial of FOA's claim. FOA also appealed, challenging the denial of its claim as well as the denial of Debtor's plan. Simultaneous with its appeal to the district court, Debtor filed a motion for a stay of the sale of the property pending appeal with the bankruptcy court. The bankruptcy court denied this motion, finding that Debtor was not likely to succeed on the merits of its appeal. Debtor appealed this ruling to the district court, which concluded that "[t]here is no likelihood of success on the merits of the appeal and no serious issue exists." Order Den. Mot. for Stay at 2; J.A. at 71. Neither Debtor nor FOA appealed to the Sixth Circuit regarding this order denying a stay. In fact, FOA never moved in any court for a stay of the sale of the property. On April 24, 1994, pursuant to Connecticut General's plan, the property in question was sold at an auction. While there were several bidders at the auction, including both Connecticut General and Debtor, Connecticut General was the highest, purchasing the property for $6.7 million.
 
 
 6
 On June 2, 1995, the district court issued its order that affirmed all of the decisions of the bankruptcy court. It concluded the following: (1) Debtor's appeal was not moot, because Michigan state law provided for a right of redemption that had not elapsed yet; (2) because Connecticut General was an undersecured creditor, its failure to disclose its legal fees did not violate 11 U.S.C. Section(s) 1129(a)(4); (3) Connecticut General did not act in bad faith when it purchased claims prior to the vote on Debtor's plan; (4) FOA's claim was properly disallowed; (5) Connecticut General's plan could properly be silent on the issue of which taxes were to be paid by the liquidating trust; and (6) Connecticut General's plan was capable of performance. District Ct. Order; J.A. at 18-44.
 
 
 7
 Debtor has appealed conclusions (2), (3), (4), and (6), and FOA has appealed conclusion (4). Debtor now also contends that because Connecticut General's plan provided for the sale of the property, it improperly granted Connecticut General a deficiency claim. In addition to contesting all of these arguments, Connecticut General alleges that appellants' appeals are now moot. Because we agree with Connecticut General that Debtor's and FOA's appeals are moot, we decline to reach the merits of appellants' arguments.
 
 II. Standard of Review
 
 8
 In a bankruptcy proceeding, the district court reviews the bankruptcy court's conclusions of law de novo and upholds its findings of fact unless they are clearly erroneous. Nicholson v. Isaacman (In re Isaacman), 26 F.3d 629, 631 (6th Cir. 1994). This court, in turn, considers directly the judgment of the bankruptcy court, "using the same standards of review as the district court." Id.
 
 III. Analysis
 
 9
 Connecticut General argues that because of bankruptcy's mootness rule, this court should not reach the merits of Debtor's or FOA's claims. "Bankruptcy's mootness rule applies when an appellant has failed to obtain a stay from an order that permits a sale of a debtor's assets." Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.), 846 F.2d 1170, 1171 (9th Cir. 1988). The bankruptcy mootness rule differs from general mootness law because it is based on "the general rule that the occurrence of events which prevent an appellate court from granting effective relief renders an appeal moot, and the particular need for finality in orders regarding stays in bankruptcy." Id. at 1172 (emphasis added) (citation omitted). See also Miami Ctr. Ltd. Partnership v. Bank of New York, 838 F.2d 1547, 1553-54 (11th Cir.), cert. denied, 488 U.S. 823 (1988) ("[Bankruptcy's mootness rule] is premised upon considerations of finality, protection of the integrity of the foreclosure sale process, and the court's inability to rescind the sale and grant relief on appeal even if the purchaser of the property is a party to the appeal . . . ." (citation omitted)). Because appellants failed to obtain a stay, Connecticut General contends that the present case falls squarely within this mootness doctrine.[1]
 
 
 10
 Bankruptcy's mootness rule is codified at 11 U.S.C. Section(s) 363(m): The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.
 
 
 11
 Subsections (b) and (c) in turn refer to transactions undertaken by the bankruptcy trustee. In this case, the sale of the building was made by the "Liquidating and Disbursing Agent," a post-confirmation trustee, created by Connecticut General's liquidation plan. See Mancuso v. Sullivan (In re Sullivan), 153 B.R. 751, 757 n.6 (Bankr. N.D. Tex. 1993) (stating that "[t]he postconformation trustee is a contractual, state-law trustee."). The first question, therefore, is whether bankruptcy's mootness rule is limited to what is codified in Section(s) 363(m).
 
 
 12
 The Ninth Circuit analyzed this question in depth and answered it in the negative. In Algeran, Inc. v. Advance Ross Corp., 759 F.2d 1421 (9th Cir. 1985), the court recognized that under former Bankruptcy Rule 805, there was no language that could potentially limit the application of bankruptcy's mootness rule to trustees alone. Analyzing the relevance of the 1983 amendments to the Bankruptcy Code, the court stated:
 
 
 13
 In the revision of the Bankruptcy Code and Rules, former Rule 805 was fragmented, and the mootness rule was incorporated into Section 363(m), which deals only with conveyances by trustees. Thus the [prior codified bankruptcy mootness rule] did not in its entirety survive the Code revision. However, in view of the fact that the mootness rule was judicially established before the 1976 amendment, and that the policies on which it is based are not particular to conveyances by trustees as opposed to other parties, we hold that the omission of the 1976 amendment from the new Code and Rules does not abrogate the judicial mootness rule.
 
 
 14
 Id. at 1424. See also Miami Ctr. Ltd. Partnership, 838 F.2d at 1553 (recognizing the application in the Eleventh Circuit of the bankruptcy mootness standard in situations other than transfers by a trustee under Section(s) 363(b) or (c)). We agree with the Ninth and Eleventh Circuits. There is no principled reason to distinguish between sales made by trustees and other sales in bankruptcy. We thus conclude along with our sister circuits that bankruptcy's mootness rule applies whenever a party in a bankruptcy proceeding fails to obtain a stay from an order permitting the sale of a debtor's assets and is not limited to conveyances by trustees.
 
 
 15
 We next must decide whether to create a broad exception to the bankruptcy mootness rule when the property is sold to a creditor who is a party to the appeal. Other circuits have not recognized such an exception. See In re Onouli-Kona Land Co., 846 F.2d at 1173; Miami Ctr. Ltd. Partnership, 838 F.2d at 1554; Tompkins v. Frey (In re Bel Air Assocs., Ltd.), 706 F.2d 301, 304-06 (10th Cir. 1983); Greylock Glen Corp. v. Community Sav. Bank, 656 F.2d 1, 4 (1st Cir. 1981). In deciding whether to recognize an exception for sales made to party-creditors, the court in In re Onouli-Kona Land Co. stated:
 
 
 16
 An absolute mootness rule would complement the absolute language of section 363(m). Such a rule would reinforce Bankruptcy Rule 8005, which establishes a procedure for stays in all appeals. The rule would avoid creating an incentive for the purchaser to take irreversible steps, and the rule would protect the interests of a bona fide purchaser against the fortuity that the purchaser is made party to the appeal.
 
 
 17
 846 F.2d at 1172.
 
 
 18
 We agree. Assuming the purchaser acts in good faith, as we discuss below, it should make little difference whether the purchaser also happens to be a creditor who is a party to the appeal. There certainly is nothing inherently wrong with a creditor purchasing property at a bankruptcy sale, and we are unwilling to endorse a rule that would cast a shadow of doubt over the finality of these transactions. A contrary conclusion on this point would severely discount the very finality considerations upon which bankruptcy's mootness rule rests. While we recognize that this rule may appear to be severe, the availability of a stay in most circumstances tempers any harshness that may exist. In this case, appellants' fatal error is that they failed to obtain a stay of the sale of the property.
 
 
 19
 The district court similarly agreed that there should not be an exception to the bankruptcy mootness rule when the property is sold to a creditor who is a party to the appeal; however, it nevertheless found that Michigan law created an applicable exception. Because the property interests of parties in bankruptcy are "created and defined by state law," Butner v. United States, 440 U.S. 48, 55 (1979), state law may provide exceptions to the bankruptcy mootness rule, unless federal interests mandate different results. Two possible exceptions arise either when real property is sold, subject to the right of redemption, to a creditor, and when state law would otherwise permit the transaction to be set aside. See Mann v. Alexander Dawson Inc. (In re Mann), 907 F.2d 923, 926 (9th Cir. 1990). In the instant case, the district court found that appellants' appeals were not moot, because Michigan law allows a mortgagor to redeem commercial property lawfully sold at any time within six months.[2] See Mich. Comp. Laws Section(s) 600.3240, 600.3140. But as Connecticut General points out, the six-month window for redemption has long since closed, and, as a result, no state-law exception exists.
 
 
 20
 The final requirement of bankruptcy's mootness rule is that the property must have been purchased in good faith. To show lack of good faith, the debtor must demonstrate that there was fraud or collusion between the purchaser and the seller or the other bidders, or that the purchaser's actions constituted "an attempt to take grossly unfair advantage of other bidders." In re Onouli-Kona Land Co., 846 F.2d at 1173. See also Miami Ctr. Ltd. Partnership, 838 F.2d at 1554; Hoese Corp. v. Vetter Corp. (In re Vetter Corp.), 724 F.2d 52, 56 (7th Cir. 1983). Appellants have made none of these allegations, and nothing in the record indicates that such allegations would be warranted. In this case, the auction of the property was attended by numerous bidders, including Connecticut General and Debtor, with Connecticut General ultimately purchasing the property for $6.7 million. Certainly nothing in this purchase price indicates bad faith. See West End Assocs., L.P. v. Sea Green Equities, 166 B.R. 572, 580 (Bankr. D.N.J. 1994) (refusing to find bad faith with a purchase price of $100, absent some other proof of irregularity, even when the value of the property was around $1 million).
 
 
 21
 Appellants do, however, allege that Connecticut General acted in bad faith in purchasing the claims of the other creditors. While these allegations do not seem to relate to the actual sale of the property, even if we were to decide that the good-faith-purchaser requirement extends to these allegations, which we decline to do today, appellants would lose on the merits here as well.
 
 
 22
 Although appellants do not contend that creditors in bankruptcy cannot purchase claims, they argue that "[c]laims purchased by a plan proponent should be disqualified under the Bankruptcy Code, 11 U.S.C. Section(s) 1126(e), as a bad faith `end-run' around the plan solicitation process, which requires solicitation of creditors through a court-approved disclosure statement." Br. for Appellant Debtor at 10. 11 U.S.C. Section(s) 1126(e) provides:
 
 
 23
 On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.
 
 
 24
 Under this section, the court can disallow the vote of any creditor who acts in bad faith in either voting or soliciting votes for or against a plan. As Connecticut General voted all of the creditors' claims that it purchased against Debtor's plan, appellants are arguing that these votes should have been disallowed.
 
 
 25
 The Bankruptcy Code does not define the good-faith requirement in Section(s) 1126(e). The courts, however, have developed various well-reasoned definitions. In Young v. Higbee Co., 324 U.S. 204 (1945), the Supreme Court analyzed the good-faith requirement under the predecessor statute to Section(s) 1126(e), and concluded that its purpose was to prevent the use of "obstructive tactics and hold-up techniques," which would in turn give some creditors an unfair advantage over other creditors in the confirmation process. Id. at 211 n.10 (citation omitted). The Fourth Circuit gave further meaning to the good-faith requirement by stating:
 
 
 26
 One who casts his vote with a purpose of coercing payment to him of more than he might reasonably perceive as his fair share of the debtor's estate, does not cast his vote in good faith.
 
 
 27
 . . . .
 
 
 28
 . . . . A creditor may not cast his vote for an ulterior purpose and expect to have it counted. Ulterior motives have been held to include "pure malice, strikes and blackmail, and the purpose to destroy an enterprise in order to advance the interests of a competing business."
 
 
 29
 Insinger Mach. Co. v. Federal Support Co. (In re Federal Support Co.), 859 F.2d 17, 19 (4th Cir. 1988) (citation omitted).
 
 
 30
 It is clear, however, that the Bankruptcy Code does not require "selfless disinterest." In re Applegate Property, Ltd., 133 B.R. 827, 834 (Bankr. W.D. Tex. 1991). Indeed, "the mere fact that a purchase of creditors' interests is for . . . securing the approval or rejection of a plan does not of itself amount to `bad faith.'" In re Allegheny Int'l, Inc., 118 B.R. 282, 289 (Bankr. W.D. Pa. 1990) (alteration in original) (citation omitted). If bad faith could be found any time a claim is purchased to block approval of a plan, there would be no incentive to purchase claims. See In re Marin Town Ctr., 142 B.R. 374, 379 (Bankr. N.D. Cal. 1992) ("Were this court to adopt Debtor's position [that bad faith exists whenever claims are purchased to block approval of a plan], investors would have little incentive to purchase claims from any creditor in bankruptcy.").
 
 
 31
 Appellants' first argument, that a plan proponent cannot also purchase claims of creditors, is meritless. Nothing in the Bankruptcy Code or the case law suggests such a rule. While a plan-proponent's purchase of votes may shed light on that proponent's motive, whether bad faith exists can only be decided after an analysis of the facts of each case. In this case, Connecticut General's actions do not fall within any of the above-mentioned bad-faith definitions. Connecticut General certainly did not take advantage of other creditors, since it offered to purchase for full value the claims of all non-insider unsecured creditors. Furthermore, there is no indication that it received more than its fair share from the sale of the property. In fact, while other creditors were paid the full value of their claims, Connecticut General was not.
 
 
 32
 Presumably forced to concede the non-applicability of the cases that focus on the unfair treatment of creditors, appellants instead argue that Connecticut General possessed an ulterior motive, either to take over Debtor, or simply to destroy Debtor at any cost. While Connecticut General did purchase the property in question at an auction, there is absolutely no indication that Connecticut General plans to enter the real-estate rental market in Birmingham, Michigan. There is also little merit to appellants' argument that Connecticut General wanted to destroy Debtor at any cost. Connecticut General did not contest the minute details of Debtor's plan in an attempt to prolong the bankruptcy process. Rather, it acquired the claims of Debtor's creditors and voted those claims against Debtor's plan, while proposing a plan of its own. Simply put, Connecticut General's actions in this case did not amount to bad faith.
 
 
 33
 For the foregoing reasons, we hold that appellants' appeals are moot. Therefore, we DISMISS both appeals for lack of jurisdiction and VACATE the decision of the district court.
 
 
 34
 RALPH B. GUY, Circuit Judge, concurring.
 
 
 35
 I concur in the court's opinion, and would only add that had we reached the merits of this case, I would have voted to affirm the district court.
 
 
 
 [1]
 Connecticut General also contends that because effective judicial relief is no longer available, this case is moot under general mootness principles. There is merit to this argument, given that the Liquidation and Disbursing Agent not only sold the property in question, but also made distributions to other creditors and paid real estate taxes on the property. Nevertheless, because we are resting our decision on bankruptcy's mootness rule, we decline to undertake the intensely factual analysis of whether the sale of the property could be undone and thus decline to determine whether these appeals would be moot under general mootness principles
 
 
 [2]
 The district court's order was issued on June 2, 1995, some thirteen months after the sale of the property. Given this fact, it is not apparent, nor have the parties advised us, why the district court relied on the six-month provision