*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0286p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

In re: MADE IN DETROIT, INC.,

*Debtor.*

---

MADE IN DETROIT, INC.,

*Plaintiff-Appellant
(04-1431),*

WILLIAM T. MERRIWEATHER; GERALD E. JOHNSON;
FRANK GLOVER; WILCO ASSOCIATES, L.L.C.;
SHAREHOLDERS OF MADE IN DETROIT, INC.,

*Plaintiffs-Appellants
(04-1517),*

*v.*

OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF
MADE IN DETROIT, INC.; TRUST FOR PUBLIC LAND,

*Defendants-Appellees.*

Nos. 04-1431/1517

> 

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 03-73605; 03-73699—
John Corbett O'Meara, District Judge.

Argued: June 2, 2005

Decided and Filed: July 1, 2005

Before: RYAN, MOORE, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Thomas R. Morris, SILVERMAN & MORRIS, West Bloomfield, Michigan, for Appellants. Robert D. Gordon, CLARK HILL, Detroit, Michigan, Barbara Rom, PEPPER HAMILTON, Detroit, Michigan, for Appellees. **ON BRIEF:** Thomas R. Morris, SILVERMAN & MORRIS, West Bloomfield, Michigan, Nansi Irene Rowe, NANSI ROWE & ASSOCIATES, Detroit, Michigan, for Appellants. Robert D. Gordon, E. Todd Sable, CLARK HILL, Detroit,

1

Michigan, Barbara Rom, Keith J. Ostrowski, PEPPER HAMILTON, Detroit, Michigan, for Appellees.

––––––––––––––––

**OPINION**

––––––––––––––––

KAREN NELSON MOORE, Circuit Judge.  In this consolidated appeal, Made in Detroit, Inc. ("MID" or the "Debtor") and a group of other parties-in-interest (collectively, the "Appellants") each challenge the district court's dismissal of their claims pursuant to 11 U.S.C. § 363(m).  The district court found that because the property at issue was sold to a good-faith purchaser, the appeal of the bankruptcy court's decision confirming the Liquidating Plan of Reorganization was statutorily moot.  Upon review, we hold that the liquidation sale was to a good-faith purchaser, and thus, we **AFFIRM** the district court's decision to dismiss the appeal on statutory grounds.

## I. BACKGROUND

On August 29, 1996, MID, a real-estate development company, purchased four hundred acres (the "Property") along the Detroit River in Gibraltar and Trenton, Michigan for approximately $3.1 million.  The Property had extensive water frontage along the river and included a wooded island.  The Property also contained several acres that were either wetlands or under water, thereby reducing the area available for development to approximately 163 acres.  MID purchased the land with the intent to build a high-end residential community which would include such amenities as a golf course, a marina, an equestrian center, and retail shops.  MID's development of the Property faced several lengthy delays, however, due to objections raised by local residents, environmentalists, and federal and state regulators.

By 2002, MID still had not obtained the necessary permits required to begin construction.  Because of the delay in obtaining the necessary permits and the fact that it was not generating any other income, MID became delinquent in payments to its secured creditors and on its property taxes.  In 2002, Standard Federal,[1] the primary secured creditor, commenced foreclosure against MID.  As a result, on October 23, 2002, MID filed a voluntary petition for relief under Chapter 11 of the bankruptcy code in the United States Bankruptcy Court for the Eastern District of Michigan.  Following the filing of the petition, MID continued to manage the Property as a debtor-in-possession.  *See* 11 U.S.C. §§ 1107(a), 1108.

After its initial two plans were rejected by the bankruptcy court, the Debtor filed its Third Amended Combined Plan of Reorganization (the "Debtor's Plan"), which outlined a financial arrangement by which the Debtor could meet its obligations to the secured creditors as well as continue development of the Property.  The Debtor's Plan relied on a $9.0 million loan from Kennedy Funding, Inc. ("Kennedy"), an asset-based lender.  The Kennedy loan was conditioned on (1) an up-front payment by the Debtor of a non-refundable commitment fee of $270,000; (2) an appraisal of the Property on an "as is" quick sale basis of at least $15 million; and (3) participation by other investors in the loan.  To raise the necessary funds to pay the commitment fee, the Debtor relied on loans from its existing shareholders because the bankruptcy court denied its motion to incur additional unsecured debt pursuant to 11 U.S.C. § 364(b).

Because of the Debtor's repeated delays in putting forth a confirmable reorganization plan, the Official Committee of Unsecured Creditors of Made in Detroit, Inc. (the "Committee") filed a motion for authority to file a competing plan of reorganization pursuant to 11 U.S.C. § 1121(c),

––––––––––––––––

[1]Standard Federal subsequently assigned its claim to Gibraltar-Trenton Development Company, LLC.

which was granted by the bankruptcy court. On July 9, 2003, the Committee filed its Liquidating Plan of Reorganization (the "Committee's Plan"), which proposed to sell the Property immediately to the Trust for Public Land ("TPL"), a non-profit conservation organization, for approximately $4.8 million to settle all of the Debtor's claims. Specifically, the proceeds from the sale would satisfy the secured creditors' claims and the various tax liens, while the residual amount would be distributed to the unsecured creditors pro rata. Under the Committee's Plan, the equity interests in the company would be extinguished.

On September 10 and 12, 2003, the bankruptcy court held a joint evidentiary hearing (the "Confirmation Hearing") to consider the two competing reorganization plans. Following the hearing, the bankruptcy court entered an order confirming the Committee's Plan for liquidation and denying the Debtor's Plan because it was unfeasible and provided too much uncertainty. Specifically, the bankruptcy court held that the Debtor's Plan did "not provide a reasonable assurance of success," but instead was "based on 'wishful thinking' and 'visionary promises.'" Joint Appendix ("J.A.") at 1426 (Bankr. Ct. Op. at 9). Therefore, the court held that the Debtor's Plan failed to satisfy the requirement specified in 11 U.S.C. § 1129(a)(11). Moreover, given the uncertainty surrounding the Kennedy loan, the court held that the Debtor's Plan failed to satisfy 11 U.S.C. § 1129(a)(9) as well. By contrast, the bankruptcy court held that the Committee's Plan for immediate liquidation did not involve any ambiguity. The court held that the sale of the Property to TPL was not only feasible but also in the best interests of the creditors, despite the Debtor's argument that TPL's purchase price severely undervalued the Property. Therefore, the bankruptcy court confirmed the Committee's Plan to liquidate MID.

Every court which addressed the issue, including this one, denied the Debtor's motion for a stay of the bankruptcy confirmation pending appeal. Accordingly, on September 29, 2003, the liquidating agent conveyed the Property to TPL by covenant deed in exchange for $4.8 million in cash. The deed was submitted to the Wayne County Register of Deeds the same day. Following consummation of the transaction, approximately $3.7 million was disbursed to creditors of the estate and used to pay overdue taxes. A year later, on September 14, 2004, TPL resold the Property to the United States Fish and Wildlife Service (the "Service").

The Debtor and a group of other parties-in-interest each separately appealed the bankruptcy court's confirmation of the Committee's Plan to the United States District Court for the Eastern District of Michigan. The district court consolidated the two appeals, and the Committee filed a motion to dismiss on the ground that the sale of the Property to TPL rendered the consolidated appeal both statutorily moot under 11 U.S.C. § 363(m) and equitably moot. The Appellants responded that its consolidated appeal was not moot because TPL was not a good-faith purchaser. On March 4, 2004, the district court dismissed the consolidated appeal, finding that TPL was in fact a good-faith purchaser, and therefore, the Appellants' claims were moot under § 363(m). This appeal followed.

Though the Appellants raise several claims in their brief regarding the bankruptcy court proceedings as well, we have limited the scope of this appeal to the issue of whether TPL was a good-faith purchaser and if not, whether the doctrine of equitable mootness applies. *Made in Detroit, Inc. v. Official Comm. of Unsecured Creditors of Made in Detroit, Inc.* (*In re Made in Detroit, Inc.*), Nos. 04-1431, 04-1517 (6th Cir. Feb. 16, 2005) (order granting the appellees' motion to dismiss in part, and denying in part).

## II. ANALYSIS

### A. Standard of Review

The bankruptcy court's conclusion that TPL was a good-faith purchaser is a mixed question of law and fact. *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997). We have stated that in reviewing a bankruptcy proceeding, "the district court reviews the bankruptcy court's conclusions of law de novo and upholds its findings of fact unless they are clearly erroneous." *255 Park Plaza Assocs. Ltd. P'ship v. Conn. Gen. Life Ins. Co. (In re 255 Park Plaza Assocs. Ltd. P'ship)*, 100 F.3d 1214, 1216 (6th Cir. 1996). Moreover, "[t]his court, in turn, considers directly the judgment of the bankruptcy court, using the same standards of review as the district court." *Id.* (internal quotation omitted).

### B. Statutory Mootness

The Appellants argue on appeal that the courts below erred in finding that TPL is a good-faith purchaser for statutory mootness purposes. Upon review, we conclude that TPL is a good-faith purchaser and thus the sale of the Property to TPL renders the Appellants' claims moot pursuant to 11 U.S.C. § 363(m).

"Bankruptcy's mootness rule applies when an appellant has failed to obtain a stay from an order that permits a sale of a debtor's assets." *Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*, 846 F.2d 1170, 1171 (9th Cir. 1988). Specifically, § 363(m) states that:

> The reversal or modification on appeal of an authorization . . . of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). This provision "limits appellate review of a consummated sale . . . regardless of the merits of legal arguments raised against it." *In re Gucci*, 126 F.3d at 392. "Section 363(m) protects the reasonable expectations of good faith third-party purchasers by preventing the overturning of a completed sale, absent a stay, and it safeguards the finality of the bankruptcy sale." *Official Comm. of Unsecured Creditors v. Trism, Inc. (In re Trism, Inc.)*, 328 F.3d 1003, 1006 (8th Cir. 2003). As a result, "[s]ection 363(m) maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property." *In re Gucci*, 126 F.3d at 387. Though the statutory provision specifically addresses a sale by a bankruptcy trustee, we have held that "[t]here is no principled reason to distinguish between sales made by trustees and other sales in bankruptcy." *In re 255 Park Plaza*, 100 F.3d at 1217; *see also Weingarten Nostat, Inc. v. Serv. Merch. Co.*, 396 F.3d 737, 742 n.4 (6th Cir. 2005) (applying § 363(m) to an assignment of a lease by a debtor-in-possession); *L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 297 (3d Cir.) (same), *cert. denied*, 531 U.S. 873 (2000). In this case, because the Appellants were denied a stay pending appeal and the Property was sold pursuant to the Committee's Plan, the only issue before us is whether TPL is a good-faith purchaser under § 363(m).

Though the bankruptcy code itself does not define the term "good faith purchaser," courts have adopted the "traditional equitable definition of a 'good faith purchaser,'" defined as "one who purchases the assets for value, in good faith, and without notice of adverse claims." *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1197 (7th Cir. 1978). Thus, to be covered under the statutory protection of § 363(m), TPL must demonstrate that it purchased the Property "in good faith" and that it did so "for value." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).

With regard to a showing of "good faith," we have held that "[t]o show lack of good faith, the debtor must demonstrate that there was fraud or collusion between the purchaser and the seller or the other bidders, or that the purchaser's actions constituted an attempt to take grossly unfair advantage of other bidders." *In re 255 Park Plaza*, 100 F.3d at 1218 (internal quotation omitted). The good-faith requirement "speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings." *In re Rock Indus.*, 572 F.2d at 1198. Thus, the purchaser's "intended use of the assets purchased is not relevant to the good faith inquiry." *In re Gucci*, 126 F.3d at 394.

Applying these principles to this case, we conclude that TPL purchased the Property in good faith. In its order confirming the Committee's Plan, the bankruptcy court specifically found that terms of the sale of the Property "are fair and reasonable, were negotiated at arms length, in good faith, and are in the best interests of the Estate."**2** J.A. at 1618 (Bankr. Ct. Order at 6). The Appellants have failed to cite any evidence in the record to establish that the process of selling the Property was tainted by fraud or collusion. The Appellants' sole argument is that TPL was acting as an agent for the Service to circumvent the Ottawa National Wildlife Refuge Complex Expansion and Detroit River International Wildlife Refuge Expansion Act (the "Act"), Pub. L. No. 108-23, 117 Stat. 704 (2003). Specifically, section 4(c)(2) of the Act states that "[a]ny and all acquisitions of land or waters under the provisions of this Act shall be made in a voluntary manner and shall not be the result of forced takings." § 4(c)(2), 117 Stat. at 707. The Appellants argue that TPL's purchase of the Property and subsequent resale to the Service violated this provision of the Act. We find this argument to be wholly without merit.

First, as the bankruptcy and district courts concluded, there is no direct evidence to support the Appellants' allegation that TPL was acting as an agent for the Service. Though it partners with federal and state agencies at times, TPL is neither an agent nor an arm of the government, but rather a private, non-profit corporation. At the time of the purchase, Alan Dean Raymond ("Raymond"), the Midwest director of projects for TPL, testified that he had preliminary discussions with the Service about the Property, but that there was no agreement in place between TPL and the Service about a transaction. J.A. at 606 (Conf. Hr'g Tr. II at 155). The purchase of the Property was not at the behest of the Service, but solely upon the authorization of TPL's board of directors. Furthermore, no public funds were used to purchase the Property. J.A. at 604 (Conf. Hr'g Tr. II at 153). The fact that TPL subsequently sold the Property to the Service a year later is without consequence.

Moreover, assuming *arguendo* that TPL was acting as an agent of the Service, we conclude that a liquidation sale of a debtor's property to a government agency is not a "forced taking" within the meaning of the Act. By using the term "forced taking," Congress was clearly referencing the federal government's power of eminent domain, whereby "the government acquires private property for a public purpose, whether the acquisition is the result of a condemnation proceeding or a physical appropriation." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321 (2002). Thus, in a taking scenario, a private party is forced to sell its property *to the government*. By contrast, in bankruptcy proceedings in which the debtor is forced to liquidate, the debtor is forced to sell its property *to anyone*. The mere fact that a government agency may purchase property in a bankruptcy liquidation sale, like any other entity in the marketplace, does not transform the liquidation into a "forced taking." In this case, the Committee was seeking a buyer for the Property, and TPL was the only one who approached it. The identity of the purchaser did not affect either the Committee's decision to liquidate or the bankruptcy court's decision to confirm

---

**2** At oral argument, MID argued that the finding of good faith by the bankruptcy court was an afterthought. The record reveals, however, that MID specifically objected to the good-faith paragraph of the Committee's proposed order and the bankruptcy court specifically considered the issue before adopting the language in its final order. J.A. at 711-12 (Conf. Hr'g Tr. II at 260-61).

the Committee's Plan. Thus, even if TPL was an arm of the Service, we conclude that TPL's purchase of the Property is still not prohibited by the Act.

Finally, we conclude that TPL's purchase of the Property was for value, thereby satisfying the final element of the definition of a "good faith purchaser." Courts have found that even "a purchaser who pays 75 percent of the appraised value of the assets has tendered value." *In re Gucci*, 126 F.3d at 390; *see also In re Abbotts*, 788 F.2d at 149; *In re Rock Indus.*, 572 F.2d at 1197 n.1. In this case, the bankruptcy court reviewed several appraisals of the Property ranging in value from $3.4 million to $18.0 million if the Property was fully developed as planned. J.A. at 1128 (Terzo & Bologna Appraisal Mar. 8, 2002); J.A. at 963 (Terzo & Bologna Appraisal Nov. 9, 1998). Moreover, the court heard testimony from Kenneth Blondell ("Blondell"), who was hired by the Committee to appraise the Property. Blondell testified that the market value of the Property was approximately $5.3 million but the liquidation value was only $4.2 million. J.A. at 388 (Conf. Hr'g Tr. I at 185); J.A. at 714-15 (Integra Appraisal). Raymond, the project manager for TPL, testified at the Confirmation Hearing that if the Property was sold pursuant to a Chapter 7 liquidation, TPL would only offer "a dollar over the value of the secured creditors," or approximately $4.0 million. J.A. at 604 (Conf. Hr'g Tr. II at 153). Given these various value benchmarks, the bankruptcy court found that the $4.8 million price offered by TPL for the Property was "fair and reasonable." J.A. at 1618 (Bankr. Ct. Op. at 6). We conclude that the bankruptcy court's finding was not clearly erroneous, and therefore, TPL's purchase of the Property was "for value."

In sum, because the sale of the Property to TPL does not violate the Act and the purchase was for value, we conclude that TPL is a good-faith purchaser and thus, the sale of the Property to TPL renders the Appellants' claims moot pursuant to 11 U.S.C. § 363(m). Moreover, because we hold that the Appellants' claims are statutorily moot, we need not reach the issue of whether equitable mootness applies.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of the Appellants' claims pursuant to 11 U.S.C. § 363(m).