*By order of the Bankruptcy Appellate Panel, the precedential effect
of this decision is limited to the case and parties pursuant to 6th
Cir. BAP LBR 8013-1(b). See also 6th Cir. BAP LBR 8010-1(c).*

**File Name:  05b0014n.06**

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

| | |
|---|---|
| In re:   QUAKER CITY CASTINGS, INC., | ) |
| | ) |
| Debtor. | ) |
| ———————————————————— | ) |
| | ) |
| SUGARLOAF INDUSTRIAL AND | ) |
| MARKETING CO., LLC, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | )   No. 04-8045 |
| | ) |
| QUAKER CITY CASTINGS, INC. and | ) |
| FOUNDRY ACQUISITION GROUP, LLC, | ) |
| | ) |
| Appellees. | ) |
| ———————————————————— | ) |

Appeal from the United States Bankruptcy Court
for the Northern District of Ohio, Eastern Division at Youngstown.
No. 03-41848.

Argued: August 3, 2005

Decided and Filed:  November 18, 2005

Before: GREGG, PARSONS, and SCOTT, Bankruptcy Appellate Panel Judges.

————————————————

**COUNSEL**

**ARGUED:**  Michael H. Freeman, THE FREEMAN LAW FIRM, Tulsa, Oklahoma, for Appellant.
Jeffrey Baddeley, BAKER & HOSTETLER, Cleveland, Ohio, Brad T. Summers, BALL JANIK,
Portland, Oregon, for Appellees. **ON BRIEF:**  Michael H. Freeman, THE FREEMAN LAW FIRM,
Tulsa, Oklahoma, Mark A. Beatrice, MANCHESTER, BENNETT, POWERS & ULLMAN,
Youngstown, Ohio, for Appellant.  Jeffrey Baddeley, Kelly S. Burgan, BAKER & HOSTETLER,
Cleveland, Ohio, Dennis J. Kaselak, LASKO & LIND CO., Cleveland, Ohio, for Appellees.

---

## OPINION

---

JAMES D. GREGG, Bankruptcy Appellate Panel Judge. Sugarloaf Industrial and Marketing Co., LLC ("Sugarloaf") appeals a bankruptcy court order approving the sale of the Debtors'[1] assets to Foundry Acquisition Group, LLC ("Foundry"). Sugarloaf had previously contracted with the Debtors to purchase real property located in Bixby, Oklahoma. That sale was never completed, and the Bixby property was ultimately included in an auction sale of substantially all of the Debtors' assets. Foundry was the successful bidder at the auction sale. Because the bankruptcy court was not clearly erroneous when it found that Foundry purchased the Debtors' assets in good faith, we AFFIRM its decision and DISMISS this appeal as moot under § 363(m) of the Bankruptcy Code.[2]

## I.   ISSUE ON APPEAL

The primary issue on appeal is whether Foundry purchased the Debtors' assets in good faith under § 363(m).[3]

## II.   JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit has jurisdiction to decide this appeal. The United States District Court for the Northern District of Ohio has authorized appeals to this

---

[1]  The Debtors are Lionheart Industries, Inc. ("Lionheart") and several of its wholly-owned subsidiaries, including Quaker City Castings, Inc. ("Quaker City"), American Foundry Group, Inc. ("American Foundry"), Penatek Industries, Inc. ("Penatek"), and Varicast, Inc. ("Varicast").

[2] The Bankruptcy Code is contained in 11 U.S.C. §§ 101-1330. Unless stated to the contrary, all future statutory references are to the Bankruptcy Code, e.g., "§ ____."

[3] On February 18, 2005, this Panel entered an order limiting the issues on appeal to Foundry's status as a good faith purchaser under § 363(m). Sugarloaf's claims pertaining to compliance with and enforcement of the Bixby property sale contract are therefore irrelevant, except to the extent that non-compliance with the contract impacts the finding of good faith. The numerous other issues raised by Sugarloaf are addressed briefly at the end of this opinion.

Panel, and a final order of the bankruptcy court may be appealed by right under 28 U.S.C. § 158(a)(1). For purposes of appeal, an order is final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494, 1497 (1989) (citations omitted). An order approving the sale of a debtor's assets is a final order. *In re Sax*, 796 F.2d 994, 996 (7th Cir. 1986).

The determination of whether Foundry purchased the Debtors' assets in good faith is a mixed question of law and fact. *Made in Detroit, Inc. v. Official Comm. of Unsecured Creditors (In re Made in Detroit, Inc.)*, 414 F.3d 576, 580 (6th Cir. 2005) (citing *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997)); *see Badami v. Burgess (In re Burgess)*, 246 B.R. 352, 355 (B.A.P. 8th Cir. 2000). When faced with a mixed question, the reviewing court must separate the question into its constituent parts and analyze each under the appropriate standard of review. *Mayor of Baltimore, Md. v. W. Va. (In re Eagle-Picher Indus., Inc.)*, 285 F.3d 522, 527 (6th Cir. 2002). Consequently, the bankruptcy court's findings of fact must be accepted unless they are clearly erroneous, while its conclusions of law are subject to de novo review. *See In re Made in Detroit, Inc.*, 414 F.3d at 580 (quoting *255 Park Plaza Assocs. Ltd. P'ship v. Conn. Gen. Life Ins. Co. (In re 255 Park Plaza Assocs. Ltd. P'ship)*, 100 F.3d 1214, 1216 (6th Cir. 1996)).

## III. FACTS

The eight affiliated Debtors in this jointly administered bankruptcy case are manufacturers of speciality metal castings. The Debtors filed their chapter 11 petitions on April 16, 2003, and, soon thereafter, began efforts to sell substantially all of their assets.[4] These efforts eventually progressed along two separate paths and included attempts to sell the assets as a unit, as well as efforts to market one specific parcel separately. The intersection of these two paths forms the basis for this appeal.

---

[4] According to testimony by the Debtors' Interim CEO, the Debtors discussed their plan to sell their assets with secured creditor Bank One, even prior to filing for chapter 11 relief.

A.  Proposed Sale of the Bixby Property to Sugarloaf.

The first path involved the proposed sale of real property owned by one of the Debtors, American Foundry, and located at 14602 South Grant Avenue, Bixby, Oklahoma (the "Bixby property"). On July 9, 2003, the Debtors filed an application to employ CB Richard Ellis ("CBRE") as their real estate agent for the sale of all, or part, of the Bixby property and a motion for authority to sell the Bixby property pursuant to 11 U.S.C. § 363. The Debtors' motion states that the Bixby property consists of an industrial building, an office building, and approximately 4.8 acres of land zoned for industrial use. It refers to the Bixby property as "surplus" that is no longer necessary for the Debtors' operations.

On August 19, 2003, the bankruptcy court entered an order authorizing the Debtors to retain CBRE as real estate agent and to sell the Bixby property. The order granted CBRE the "exclusive right" to sell the Bixby property. It also authorized the Debtor to enter into a contract for sale of the Bixby property without further court approval, provided the purchase price under the contract equaled or exceeded ninety percent of the list price. Upon consummation of the sale, the order required the Debtors to file a notice identifying the purchaser and describing the terms of the sale.

On November 13, 2003, the Debtors and Sugarloaf entered into a Commercial Sale and Purchase Agreement relating to the Bixby property. The Debtors filed a notice of sale of the Bixby property to Sugarloaf with the bankruptcy court on November 20, 2003. Because the purchase agreement included an additional parcel that was not previously included in the description of the Bixby property, the notice afforded a ten day period for objections to the sale. If no objections were received, the notice stated that bankruptcy court approval of the sale would be sought without a further hearing.

Before the sale was approved by the bankruptcy court, the agent preparing the title work for the Bixby property discovered that several parties holding liens on the property had not been given notice of the sale. A second notice was prepared in January 2004. Again, this notice failed to include all lienholders. Finally, on March 2, 2004, an amended notice of sale of the Bixby property, providing notice to all lienholders and parties in interest, was filed by the Debtors.

B.  Auction Sale of All Assets.

While the  Bixby sale was pending, the Debtors were also discussing a package sale of their assets with two potential buyers, Pensler Capital Corporation ("Pensler") and Foundry.  Although Pensler was not originally interested in acquiring the Bixby property, Foundry insisted that the Bixby property be included in any proposed sale.

On October 9, 2003, the Debtors filed a Motion for Order (A) Granting Authority to Sell Assets at Auction Pursuant to § 363(b); (B) Establishing Auction Procedures; (C) Setting Date for Sale and Hearing on Sale; and (D) Approving Form of Notice.  The proposed auction contemplated going-concern sales of substantially all of the assets of four Debtors:  American Foundry in Muskogee and Bixby, Oklahoma; Quaker City in Salem, Ohio; Varicast in Portland, Oregon and Vancouver, Washington; and Penatek in Odessa, Texas.  The auction procedures permitted the Debtors to consider bids on specific portions of the assets at the various locations as well as offers to purchase the assets as a whole.

The bankruptcy court granted the Debtors' motion by order entered on November 19, 2003 (the "Auction Sale Order").  Among other things, the Auction Sale Order provided:

> Any and all sales of the Assets shall be the result of good faith arm's length negotiation with a disinterested buyer or buyers.  Any and all sales of the Assets pursuant to the Motion shall be deemed to reflect a fair and reasonable price as determined by the Debtors based on competing bids and to be in good faith and for fair value within the meaning of 11 U.S.C. § 363(m) . . . .

Appellant's App. at 84.  Under the Auction Sale Order, the auction sale was scheduled for January 8, 2004, and the hearing to approve the sale was set for January 15, 2004.  The auction was subsequently continued to May 13, 2004, and the sale hearing was rescheduled for May 20, 2004.

C.  Adversary Proceeding and Motion for Temporary Restraining Order.

On May 11, 2004, two days prior to the auction, Sugarloaf filed an adversary proceeding and motion for a temporary restraining order to enjoin the Debtors from including the Bixby property in the auction sale.  Sugarloaf's motion was resolved by entry of an agreed order prior to the auction

sale. The agreed order required that the Bixby property be "offered for bid as a separate item as well as being included at Debtors' option in a bid package or packages" at the auction. Appellee's App. at 351.

D. Auction Sale.

The auction began on the morning of May 13, 2004, and was attended by five prospective purchasers. As a result of extended negotiations on price and terms of sale, the auction lasted nearly ten hours. At the auction, the Debtors solicited offers on all of the assets as a unit. Each asset, including the Bixby property, was also offered separately.

Foundry's bid for the assets as a unit was $7,750,000, which included assumption of $400,000 in unsecured debt.[5] Sugarloaf and Pensler submitted a joint bid for the properties as a unit, but the amount of the bid was less than Foundry's offer. In addition, while Foundry was prepared to close the sale within two weeks, the Sugarloaf/Pensler bid contained contingencies regarding environmental conditions on the property and the outcome of union negotiations. Two bids – including a $525,000 bid from Sugarloaf for the Bixby property[6] – were received for individual properties. However, the total of those bids was much less than the bids for the assets as a whole.[7] Based on the foregoing, the Debtors concluded that Foundry had submitted the highest and best bid for the assets.

E. Bankruptcy Court Approval of the Sale to Foundry.

On May 20, 2004, the bankruptcy court held a hearing on the proposed sale to Foundry. As a result of several prior continuances, the court conducted a hearing on the amended notice of sale

---

[5] The amount of Foundry's bid was misstated in the bankruptcy court's June 4, 2004 Order Approving Sale of Assets, but was corrected in the June 10, 2004 Supplemental Order.

[6] Sugarloaf's bid on the Bixby property consisted of $400,000 in cash and a purported credit bid of $125,000 for waiver of its alleged damage claim.

[7] A bid of $2,400,000 was received for Quaker City Castings. Combined with Sugarloaf's bid for the Bixby property, the total of the individual bids, $2,925,000, was significantly less than Foundry's $7,500,000 bid for the entire asset package.

of the Bixby property to Sugarloaf at the same time. At this hearing, the court heard argument from attorneys for the Debtors, the secured lender, Bank One, and Sugarloaf. The court also heard testimony from Phillip Jones ("Jones"), Lionheart's Interim CEO. Jones testified that some of the members of Foundry were also employees of the Debtors. Those members of Foundry included Dan Schwartz, President of Lionheart and Manager of the Vericast Portland, Oregon and Vancouver, Washington plants; Perry Chapman, "head" of Penatek; Yogi Marconi, Senior Manager at American Foundry in Oklahoma; and Phillip Harper, Senior Manager at American Foundry in Bixby, Oklahoma. Jones explained that he was not a participant in Foundry and had not discussed employment, consulting, or any other continuing role in the business with members of Foundry.

Jones also acknowledged that a representative of Foundry had communicated with union leaders at the various plants prior to the auction sale. Although these negotiations occurred without Jones' knowledge or approval and resulted in concessions that were eventually withdrawn by the union, Jones confirmed that other bidders did not have similar access to union leaders. However, Jones stated that all records requested by Pensler were supplied by the Debtors. At the conclusion of the hearing, the court took the matter under advisement.

On May 28, 2004, after the hearing and prior to the bankruptcy court issuing its decision, Sugarloaf filed a supplemental objection to approval of the sale to Foundry. In support of its objection, Sugarloaf submitted an affidavit from Seth A. Akabas, Secretary of Pensler (the "Pensler affidavit"). In essence, the Pensler affidavit stated that: (1) throughout its negotiations with the Debtors, Pensler believed that the Bixby property was subject to a separate sale; (2) Pensler was denied contact with union representatives; and (3) Pensler perceived that the "insider" status of Foundry's members had a "chilling effect" on the auction sale.

On June 4, 2004, the bankruptcy court entered an order approving the sale of the Debtors' assets to Foundry and overruling Sugarloaf's objections to the sale (the "June 4 Order"). The bankruptcy court found that the evidence presented at the hearing established that a sale of the Bixby property had not been concluded. Further, there were no grounds for specific performance of the sale contract. The court also found that notice of the auction sale was appropriate and that Sugarloaf was not the highest bidder for the Bixby property. Finally, the court rejected Sugarloaf's assertions that Foundry was not a disinterested party. Although some members of Foundry were also employed by

the Debtors, the court explained that the "watchword" for auction sales conducted in the bankruptcy court is that the sale be to the highest and best bidder. "This consideration overrides concern about relationships between a bidder and the subject of the bid. The conclusion might be different if the objector was a higher bidder, but that is not the case here." Appellant's App. at 190. In rendering its decision, the court declined to consider the Pensler affidavit because the testimony contained therein was not subject to cross-examination and because it did not contradict testimony offered at the sale approval hearing.

On June 9, 2004, the Debtors filed an emergency motion asking the bankruptcy court to correct and supplement the findings of fact and conclusions of law in the June 4 Order. The bankruptcy court issued a supplemental order on June 10, 2004 (the "June 10 Order"). The June 10 Order specifically found:

> The auction sale on May 13, 2004 was in all respects consistent with, and met, the criteria set forth in the order of the court of November 19, 2003 [which required a good faith, arm's length transaction with a disinterested buyer or buyers].
>
> . . . The consummation of the Sale by Debtors is in the best interests of Debtors, their creditors and all parties-in-interest.
>
> . . . The proposed Sale of the Assets and terms for transfer thereof pursuant to this Order comply with all applicable provisions of Sections 363 (including subpart (f) and 365 of the Bankruptcy Code[)].
>
> . . . Neither Debtors, nor their officers, employees, or agents have colluded with Buyers, their officers, employees or agents in any manner to violate Section 363(n) of the Bankruptcy Code . . . .

Appellant's App. at 211-12.

F. Procedural History Before the Bankruptcy Appellate Panel.

Sugarloaf filed its notice of appeal with the bankruptcy court on June 14, 2005. Sugarloaf also filed an emergency motion for stay pending appeal, which was denied by the bankruptcy court on June 17, 2004. Sugarloaf requested a stay pending appeal which was denied by this Panel on July

21, 2004.[8]  On November 15, 2004, the Debtors filed a motion to dismiss this appeal.  The Panel entered an order on February 18, 2005, granting the motion to dismiss "except to the extent the appeal challenges the good faith status of the purchaser of the debtor's property."

## IV.    DISCUSSION

A.  Good Faith Under § 363(m).

Section 363(m), sometimes referred to as the bankruptcy mootness rule, states that

[t]he reversal or modification on appeal . . . of a sale or lease of property does not affect the validity of a sale or lease . . . to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Sugarloaf was not successful in obtaining a stay, so the mootness rule applies unless Sugarloaf demonstrates that Foundry failed to purchase the Debtors' assets in good faith.

Because the Bankruptcy Code does not define "good faith purchaser," many courts, including the Sixth Circuit Court of Appeals, have adopted a traditional equitable definition of the phrase as "one who purchases the assets for value, in good faith, and without notice of adverse claims." *Made in Detroit, Inc. v. Official Comm. of Unsecured Creditors (In re Made in Detroit, Inc.)*, 414 F.3d 576, 581 (6th Cir. 2005) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1197 (7th Cir. 1978)).  "Thus, to be covered under the statutory protection of § 363(m), [the purchaser] must demonstrate that it purchased the [p]roperty 'in good faith' and that it did so 'for value.'" *In re Made in Detroit, Inc.*, 414 F.3d at 581 (quoting *Cumberland Farms Dairy, Inc. v. Nat'l Farmers' Org., Inc. (In re Abbotts Dairies of Penn., Inc.)*, 788 F.2d 143, 147 (3d Cir. 1986)).  There is no dispute that Foundry tendered substantial value for the assets.  Therefore, the entire inquiry focuses on Foundry's "good faith."

The Sixth Circuit instructs that "[t]o show lack of good faith, the [appellant] must demonstrate that there was fraud or collusion between the purchaser and the seller or the other

---

[8] On September 20, 2004, the Panel also denied Sugarloaf's motion for reconsideration of denial of the stay pending appeal.

bidders, or that the purchaser's actions constituted 'an attempt to take grossly unfair advantage of other bidders.'" *255 Park Plaza Assocs. Ltd. P'ship v. Conn. Gen. Life Ins. Co. (In re 255 Park Plaza Assocs. Ltd. P'ship)*, 100 F.3d 1214, 1218 (6th Cir. 1996) (quoting *In re Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*, 846 F.2d 1170, 1173 (9th Cir. 1988)) (additional citations omitted). "The good-faith requirement 'speaks to the integrity of [the purchaser's] conduct in the course of the sale proceedings.'" *In re Made in Detroit, Inc.*, 414 F.3d at 581 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1198); *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (the good faith inquiry does not extend to a purchaser's general business practices, but only to its "actions in preparation for and during the sale itself").

Through repeated and colorful accusations, the voluminous paperwork filed by Sugarloaf in this appeal attempts to characterize the sale of the Debtors' assets to Foundry as an "unfair," "deceptive," and "fraudulent" scheme, "controlled" and "manipulated" by the Foundry "insiders" for their sole benefit. These conclusory allegations, though emphatically stated in many ways, are sorely lacking in any evidentiary support whatsoever.

Many of Sugarloaf's bald allegations stem from the alleged insider status of some of the members of Foundry. Included in this category are claims that the insiders "orchestrated" the objections that were filed to the amended notice of sale of the Bixby property as a "ruse" to enable them to jockey the auction sale ahead of the Bixby property closing; that the insiders, as the only bidders interested in purchasing the Bixby property, colluded with the Debtors to have the property included in the auction sale; that the insiders had opportunities to negotiate with union leaders that gave them an unfair advantage in the sale process; and suggestions that the bidding at the auction was chilled when it became apparent that the insiders would not agree to work for bidders other than Foundry. These allegations quickly evaporate for several reasons.

First, Sugarloaf's characterization of Foundry as an insider of the Debtors is highly questionable. Under the Code definition,"insider" includes –

> (B) if the debtor is a corporation–
>     (i) director of the debtor;
>     (ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor[.]

11 U.S.C. § 101(31). While some of Foundry's individual members appear to meet this definition, Sugarloaf has cited no authority for the proposition that Foundry, a distinct legal entity, should be deemed an insider based solely on the status of its members.

Second, and more importantly, even assuming *arguendo* that the relationship of Foundry's members to the Debtors renders Foundry an insider, § 363(b) does not prohibit insiders from purchasing estate assets. *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998); *cf. In re 255 Park Plaza Assocs. Ltd. P'ship*, 100 F.3d at 1217-18 (declining to create an exception to the bankruptcy mootness rule when the purchaser is also a creditor and stating that "[t]here certainly is nothing inherently wrong with a creditor purchasing property at a bankruptcy sale."). Indeed, "it is not 'per se bad faith' for an insider to purchase assets of a debtor and 'a sale to [an insider] without more would not suffice to show a lack of good faith.'" *In re Bakalis*, 220 B.R. at 537 (quoting *In re Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986)). Insiders do not forfeit their good faith status unless it is shown that they colluded with the debtor or engaged in conduct that was intended to control the sale price or take unfair advantage of other bidders. *See In re Bakalis*, 220 B.R. at 538 (citing *In re Gucci*, 126 F.3d at 391).

Sugarloaf has offered no evidence to substantiate its allegations of collusion between the members of Foundry and the Debtors. There is likewise no evidence that Foundry obtained an unfair advantage over other bidders or that its actions were designed to directly impact the sale price. Specifically, there is nothing in the record to support Sugarloaf's claim that the insiders colluded with the Debtors to have the Bixby property included in the auction. There is no evidence to suggest that the decision to offer the Bixby property as part of the overall asset sale, as well as a separate parcel, was anything other than a decision made by the Debtors, in exercise of their business judgment, to maximize the value of their assets. There is similarly no support for the claim that Foundry "orchestrated" the objections that were filed to the amended notice of sale of the Bixby property. Although testimony at the sale hearing revealed that discussions between Mr. Schwartz, a member of Foundry, and union leaders occurred prior to the auction sale, these discussions took

place without the knowledge or consent of the Debtors. It does not appear that Foundry gained an unfair advantage as a result of these discussions, as the negotiated concessions were ultimately withdrawn by the union. As an unavoidable practical matter, other bidders did not have similar access to union representatives. However, the testimony at the sale hearing established that all requests for information and records by other potential bidders were granted by the Debtors' management.

Third, it is worth noting that the relationship between the members of Foundry and the Debtors was fully disclosed to the bankruptcy court. *See Kabro Assocs. of West Islip, LLC, v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 277 (2d Cir. 1997) (citing *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (court was "hard pressed" to find bad faith when challenged relationship between bidder and debtor "was fully disclosed to the Bankruptcy Court") (additional citations omitted). Such disclosure may "weigh heavily" in the good faith determination. *Id*.

Other allegations raised by Sugarloaf are similarly without merit. Sugarloaf argues that the good faith of the sale to Foundry was compromised by the fact that the Debtors "switched" sale paths and intentionally violated the Bixby property sale contract. However, the Debtors' decision to sell the Bixby property as part of an overall asset sale instead of as a separate parcel is far more likely a result of the Debtors' desire to maximize the value of their assets, rather than evidence of fraud or bad faith. This is an appropriate goal, since "[w]hen a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold." *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr. W.D. Mich. 1995) (citing *In re Integrated Res., Inc.,* 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *aff'd,* 147 B.R. 650 (S.D.N.Y. 1992)). Nothing in the record suggests a more sinister motive.

Sugarloaf also argues that the sale to Foundry must be set aside because the Auction Sale Order requires that prospective buyers be "disinterested." The term "disinterested person" is defined by the Code as one who "is not a creditor, an equity security holder, or an insider" and who "is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor . . . ." 11 U.S.C. § 101(14)(A) & (D). As a limited liability company, separate and distinct from its members, Foundry is none of these things. The record indicates that

several members of Foundry were employed by the Debtors, and at least one of those members was an officer of one of the Debtor corporations. However, this indirect relationship between the members of Foundry and the Debtors, which was fully disclosed to the bankruptcy court, does not preclude a finding that Foundry was "disinterested." *Cf.* 11 U.S.C. § 101(14)(E) (excluding from the definition of "disinterested person[s]" those who "have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct *or indirect* relationship to, connection with, or interest in, the debtor or an investment banker [identified in other subsections of the definition].") (emphasis added). Accordingly, the bankruptcy court's conclusion that the sale to Foundry met the requirements of the Auction Sale Order was proper.

B. Ancillary Issues.

In addition to the good faith issues discussed above, Sugarloaf's appellate brief raises a number of peripheral issues. Like Sugarloaf's other arguments, these attacks on the sale order, and the events preceding its entry, are unavailing.

First, Sugarloaf asserts that the bankruptcy court erred by refusing to permit Sugarloaf to fully inquire into collusion and bad faith issues at the sale hearing. It also claims that the visiting bankruptcy judges who handled the case "failed to properly comprehend the full nature of the bad faith" and violations of the Bixby property sale order. These allegations are wholly without merit. It is true that prior to the testimony of the Debtors' witness Jones, the bankruptcy judge stated that he was satisfied that the record was adequate with regard to the Bixby property transaction. Therefore, the judge asked that further testimony be limited to the circumstances surrounding the auction sale itself. There was nothing improper about imposing such limits. Nor is there anything in the record to support Sugarloaf's suggestion that the bankruptcy judge failed to adequately understand the relevant facts or procedural history of the case.

Second, Sugarloaf alleges that the bankruptcy court erred by entering the ex parte supplemental June 10 sale order containing good faith findings not in the original June 4 order. Sugarloaf's argument is defeated by Federal Rule of Bankruptcy Procedure 7052, which incorporates Federal Rule of Civil Procedure 52(b) and provides: "[o]n a party's motion filed not later than 10

days after entry of judgment, the court may amend its findings – or make additional findings – and may amend the judgment accordingly." The Debtors' motion for supplemental findings was timely, and entry of the supplemental order was appropriate.

Third, Sugarloaf alleges that there was insufficient time for discovery between the auction sale on May 13 and the hearing to approve the sale on May 20 and that it did not know the May 20 sale hearing was to be an evidentiary hearing. However, there is no evidence to suggest that Sugarloaf was prejudiced by the timing of the sale hearing.

Likewise, there is no evidence to support Sugarloaf's claims that it was surprised or prejudiced by the manner in which the sale approval hearing was conducted. Federal Rule of Bankruptcy Procedure 9014(e) requires the bankruptcy court to "provide procedures that enable parties to ascertain at a reasonable time before any scheduled hearing whether the hearing will be an evidentiary hearing at which witnesses may testify." Sugarloaf is correct that the notice of sale hearing does not specifically state that it will be an evidentiary hearing at which witnesses will be permitted to testify. Despite this, Sugarloaf was represented by counsel at the hearing. Sugarloaf's attorneys cross-examined the Debtors' witness and proffered testimony that was accepted by the bankruptcy court over objection. Most importantly, at the hearing, Sugarloaf's attorneys neither objected to the adequacy of the notice nor requested a continuance to further prepare evidence or locate witnesses. These failures suggest that Sugarloaf's objections to the adequacy of the notice arise more from hindsight than from any legitimate prejudice. Collateral attacks on the sale order should not succeed on this basis. *See First Nat'l Bank v. Muller (In re Muller)*, 851 F.2d 916, 919 (7th Cir. 1998) (objections to the adequacy of notice must be raised by the party complaining about the notice when the party first appears at the hearing); *see generally R.D.F. Devs., Inc. v. Sysco Corp. (In re R.D.F. Devs., Inc.)*, 239 B.R. 336, 340 (B.A.P. 6th Cir. 1999) ("Appellate courts ordinarily do not consider issues raised for the first time on appeal and an argument is waived that is not first presented to the bankruptcy court.") (citations and internal quotations omitted).

Finally, Sugarloaf claims that the bankruptcy court erred in refusing to admit the Pensler affidavit, which was submitted eight days *after* the conclusion of the sale hearing. Again, Sugarloaf's argument lacks merit. The bankruptcy court was correct to exclude the Pensler affidavit from the trial record, *see* Fed. R. Bankr. P. 9017 (incorporating Fed. R. Civ. P. 43(a)), because the

testimony contained in the affidavit would be inadmissible hearsay. Fed. R. Evid. 801 & 802. *See Gen. Elec. Capital Corp. v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms, Inc.)*, 283 B.R. 537, 543 n. 5 (B.A.P. 8th Cir. 2002).

In addition, the bankruptcy court recognized that the statements contained in the affidavit tended to support, rather than contradict, the testimony presented at the sale hearing. The record already disclosed that the Bixby property was, at one time, subject to a purchase agreement with Sugarloaf. The Debtors also acknowledged, through Jones' testimony at the sale hearing, that the Debtors did not give Pensler access to union leaders. And Pensler's perceptions regarding the effect of Foundry's "insider members" carry little weight, as previously discussed. Thus, even if the affidavit had been admitted, it was redundant and would not have affected the court's good faith determination.

## V. CONCLUSION

Sugarloaf has failed to demonstrate that the sale of the Debtors' assets to Foundry was tainted by fraud, collusion, unfair advantage, or other indicia of lack of good faith. It has similarly failed to establish any procedural deficiency that would undermine the bankruptcy court's good faith finding. Accordingly, the bankruptcy court's conclusion that Foundry purchased the Debtors' assets in good faith is AFFIRMED, and this appeal is DISMISSED as moot pursuant to § 363(m).